2002-NMSC-005

42 P.3d 814

**STATE of New Mexico,
Plaintiff–Appellee,**

v.

**Chris TRUJILLO, Defendant–Appellant.**

**No. 26,108.**

Supreme Court of New Mexico.

Feb. 5, 2002.

Rehearing Denied March 19, 2002.

Freedman, Boyd, Daniels, Hollander, Goldberg & Cline, P.A., Lisa N. Cassidy, Albuquerque, NM, Phyllis H. Subin, Chief Public Defender, Nancy M. Hewitt, Assistant Appellate Defender, Santa Fe, NM, for Appellant.

Patricia A. Madrid, Attorney General, M. Anne Kelly, Assistant Attorney General, Santa Fe, NM, for appellee.

## OPINION

BACA, Justice.

{1} Defendant Chris Trujillo was convicted of first-degree depraved-mind murder, conspiracy to commit first-degree depraved-mind murder, aggravated assault, conspiracy to commit aggravated battery, conspiracy to commit shooting at a dwelling or occupied building (great bodily harm), conspiracy to commit shooting at a dwelling or occupied building (resulting in injury), shooting at a dwelling or occupied building (no injury), and conspiracy to commit shooting at a dwelling or occupied building (no injury).[1] The jury found Defendant not guilty of aggravated battery, aggravated assault, shooting at a dwelling or occupied building (great bodily injury), and shooting at a dwelling or occupied building (resulting in injury).

{2} Pursuant to Rule 12–102(A)(1) NMRA 2002, Defendant raises the following issues on appeal: (1) the admission of the tape and transcript of Joseph Ortiz's out-of-court statement violated Defendant's constitutional right to confrontation and due process because it was inadmissible impeachment and hearsay evidence; (2) his conviction for first-degree depraved-mind murder violated due process of law because sufficient evidence did not support the conviction on any theory; (3) Defendant was convicted of a crime that does not exist—conspiracy to commit depraved-mind murder; (4) there was no evidence that Defendant shot at a dwelling or occupied building; (5) Defendant's trial counsel's performance constituted ineffective assistance of counsel; (6) the prosecutor's acts of misconduct distorted the evidence on the issue of identification, depriving Defendant of due process and a fair trial; (7) the conspiracy charges and Defendant's convictions violate the Double Jeopardy Clause because there is no evidence of any agreement or agreements to support separate charges; (8) the above constitute cumulative error that denied Defendant due process and a fair trial; and (9) Defendant's sentence is disproportionate and in violation of the state and federal constitutional prohibitions against cruel and unusual punishment. We affirm Defendant's convictions for first-degree depraved-mind murder and conspiracy to commit aggravated battery. We vacate Defendant's conviction for conspiracy to commit depraved-mind murder and reverse Defendant's convictions for conspiracy to commit shooting at a dwelling or occupied building (great bodily harm), conspiracy to commit shooting at a dwelling or occupied building (resulting in injury), shooting at a dwelling or occupied building (no

---

1. Pursuant to NMSA 1978, § 30–2–1(A)(3) (1994) (first-degree depraved-mind murder); § 30–2–1(A)(3) and NMSA 1978, § 30–28–2(B)(1) (1979) (conspiracy to commit first-degree depraved-mind murder); NMSA 1978, § 30–3–2(A) (1963) and NMSA 1978, § 31–18–16 (1993) (aggravated assault); NMSA 1978, §§ 30–3–5(A) & (C) (1969) and NMSA 1978, § 30–28–2(B)(3) (1979) (conspiracy to commit aggravated battery); NMSA 1978, § 30–3–8(A) (1993) and NMSA 1978, § 30–28–2(B)(2) (1979) (conspiracy to commit shooting at a dwelling or occupied building (great bodily harm)); § 30–3–8(A) and § 30–28–2(B)(3) (conspiracy to commit shooting at a dwelling or occupied building (resulting in injury)); § 30–3–8 (shooting at a dwelling or occupied building (no injury)); and § 30–3–8(A) and § 30–28–2(B)(3) (conspiracy to commit shooting at a dwelling or occupied building (no injury)).

injury), and conspiracy to commit shooting at a dwelling or occupied building (no injury).

## I.

{3} On July 3, 1997, Defendant and Charlie Allison were outside on a second-floor apartment balcony in the Barelas neighborhood of Albuquerque when they became involved in an argument with four men located at ground level: Joseph Ortiz, Juan Ortega, Jesus Canas, and Javier Mendez. As a result of this argument, shots were fired from the upstairs balcony at a downward angle, killing Mendez and wounding Canas. The State introduced evidence that Defendant and Allison were members of the Barelas gang, and that Ortega, Canas, and Mendez were members of a rival gang, the Juaritos Maravilla.

{4} Ortiz, Allison's cousin, was a former Barelas gang member who had been "ranked out" and was apparently no longer welcome in the area. He testified that he had planned to meet up with Mendez at the apartments on the day of the shooting and that soon after he arrived he heard an argument and gunshots. Shortly after the shots were fired, Ortiz ran after Mendez and found him lying face down in the alley. However, Ortiz apparently could not recall more specific details of the shooting, including who fired the gun. As a result, the prosecutor played the tape of an interview between Ortiz and Detective Shawn conducted a few hours after Mendez was killed. In that interview Ortiz stated that he did not recognize the shooters but described them as a "little guy" wearing light blue jeans and a striped shirt, presumably Defendant, and a "big guy" wearing black jeans and a black t-shirt, presumably Allison. According to Ortiz, even though the bigger guy asked for the gun, the little guy did not want to give it to him, telling the four down below, "You guys think I'm joking," before he began shooting.

{5} Ortega testified that someone on the balcony asked the four men what they were doing in the Barelas neighborhood and that Mendez responded, "We could be anywhere we want, Juaritos." Immediately thereafter shots were fired down at them from the balcony. Ortega stated that Allison was the original shooter, firing two or three times at Mendez, and then Defendant took the gun and shot at Canas and Ortega. On the night of the shooting, Ortega identified Defendant as one of the shooters from a photo array shown to him by Detective Shawn. Ortega again identified Defendant at trial as the second shooter.

{6} Detective Doug Shawn, the officer assigned to the case, testified that he interviewed several eyewitnesses to the shooting, all of whom identified Defendant as one of the shooters and indicated that only one gun had been used. Detective Shawn stated that on the night of the shooting Ortega identified Defendant as one of the shooters from a photo lineup and that he recorded this identification. He also testified that Ortiz identified Defendant as one of the shooters from a photo lineup as well but refused to have his identification recorded.

## II.

{7} Defendant was tried, convicted, and sentenced for first-degree murder as a serious youthful offender pursuant to NMSA 1978, § 31–18–15.3(D) (1993), which allows a district court to "sentence the offender to less than, but not exceeding, the mandatory term for an adult." NMSA 1978, § 31–18–14(A) (1993) grants the district court discretion in sentencing minors who have been convicted of a capital felony: "[I]f the defendant has not reached the age of majority at the time of the commission of the capital felony for which he was convicted, he *may be* sentenced to life imprisonment but shall not be punished by death." (Emphasis added.) Exercising this discretion, the trial court sentenced Defendant to a "term of THIRTY (30) YEARS, BUT NOT LIFE" for his first-degree murder conviction. The trial court also provided that "[i]t is this Court's intention that the Defendant be eligible for good time credit as to the sentence imposed." (Emphasis omitted.) Defendant invoked this Court's mandatory appellate jurisdiction based on his first-degree murder conviction and because he was sentenced to thirty years in prison.

{8} This Court's mandatory appellate jurisdiction is not based on a prison sentence to a term of years, nor is it based on a first-degree murder conviction. Our mandatory appellate jurisdiction is constitutional and is limited to "[a]ppeals from a judgment of the district court imposing a sentence of death or life imprisonment." N.M. Const. art. VI, § 2. This Constitutional provision is buttressed by Rule 12–102(A)(1) and NMSA 1978, § 34–5–8(A)(3) (1983) which reiterate this limitation to our jurisdiction. Rule 12–102(A)(1) provides that "appeals from the district courts in which a sentence of death or *life imprisonment* has been imposed" shall be taken to the Supreme Court. Section 34–5–8(A)(3) indicates that the Court of Appeals has appellate jurisdiction over criminal actions, "except those in which a judgment of the district court imposes a sentence of death or *life imprisonment*." (Emphasis added.) While a life sentence has never been interpreted to mean a sentence to imprisonment for the duration of the defendant's natural life, it has been interpreted to mean thirty years of imprisonment before the possibility of parole or reduction of sentence through good time credits. *See Martinez v. State,* 108 N.M. 382, 383, 772 P.2d 1305, 1306 (1989). Defendant in this case was sentenced to thirty years of imprisonment, with the judge explicitly providing that he be eligible for good time credit. This case raises the unique jurisdictional issue of whether a serious youthful offender convicted of first-degree murder is allowed to invoke our mandatory appellate jurisdiction even though he is sentenced to less than life imprisonment due to the discretion afforded district court judges when sentencing serious youthful offenders convicted of a capital felony.

{9} We conclude that serious youthful offenders convicted of first-degree murder shall be allowed to invoke this Court's mandatory appellate jurisdiction under Article VI, Section 2 of the New Mexico Constitution and Rule 12–102(A)(1). In New Mexico, "[w]hoever commits murder in the first degree is guilty of a capital felony." Section 30–2–1. "When a defendant has been convicted of a capital felony, he shall be punished by life imprisonment or death." Section 31–18–14(A). Thus, under our law,

adults convicted of first-degree murder may appeal directly to the Supreme Court, as of right, because they will always be sentenced to life imprisonment or death, while it appears juvenile offenders convicted of first-degree murder may not be able to appeal their convictions directly to the Supreme Court because the trial court has discretion to sentence them to less than a life sentence. From the onset of New Mexico jurisprudence, first-degree murder convictions have been appealed directly to this Court, and even after the creation of the Court of Appeals, this Court retained this crucial area of jurisdiction. We have developed the entire body of New Mexico case law for first-degree murder cases, and it would only create confusion and inconsistency for the rare case of a serious youthful offender convicted of first-degree murder but sentenced to less than life imprisonment to proceed first to the Court of Appeals when all other first-degree cases proceed directly to this Court. It is unlikely that either the drafters of Article VI, Section 2 of the New Mexico Constitution, or this Court when it adopted Rule 12–102(A)(1), considered, or even foresaw, this issue when adopting the language limiting our mandatory appellate jurisdiction for criminal appeals to only those "[a]ppeals from a judgment of the district court imposing a sentence of death or life imprisonment." N.M. Const. art. VI, § 2. It makes little sense to allow adults convicted of first-degree murder to appeal directly to this Court, but to force juveniles convicted of the same crime to first appeal to the Court of Appeals.

{10} " 'It is the duty of this court to interpret the various provisions of the Constitution to carry out the spirit of that instrument.' " *Bd. of County Comm'rs v. McCulloh,* 52 N.M. 210, 215, 195 P.2d 1005, 1008 (1948) (quoting *State ex rel. Ward v. Romero,* 17 N.M. 88, 100, 125 P. 617, 621 (1912)). Furthermore, it is the policy of this Court to construe its rules liberally so that causes on appeal may be determined on their merits. *See Danzer v. Prof'l Insurors, Inc.,* 101 N.M. 178, 180, 679 P.2d 1276, 1278 (1984); *see also Govich v. N. Am. Sys.,* 112 N.M. 226, 230, 814 P.2d 94, 98 (1991); *Lowe v. Bloom,* 110 N.M. 555, 555, 798 P.2d 156,

156 (1990). Accordingly, we hold that serious youthful offenders convicted of first-degree murder shall be allowed to invoke this Court's mandatory jurisdiction under Article VI, Section 2 of the New Mexico Constitution and Rule 12–102(A)(1). Thus, jurisdiction in this case is proper and we review Defendant's appeal on the merits.

### III.

{11} Defendant's first argument is that the trial court erred by admitting the tape and transcript of Ortiz's out-of-court statements. Defendant's argument on this point is two-fold: (1) the trial court's admission of the evidence violated Defendant's constitutional right to confront the witnesses against him; and (2) the trial court erred in ruling that the evidence was admissible.

### A.

■ {12} Defendant first argues that the admission of the tape and transcript of Ortiz's out-of-court statement violated his right to confront the witness against him under the Sixth Amendment to the United States Constitution as applied to the States by the Fourteenth Amendment, and under Article II, Section 14 of the New Mexico Constitution. Defendant asserts that, as a result, the admissibility of this evidence should be reviewed de novo rather than for an abuse of discretion. *See State v. Lopez*, 2000–NMSC–003, ¶ 10, 128 N.M. 410, 993 P.2d 727. As a preliminary matter, we must first consider the question of whether Defendant "preserved the confrontation issue for appellate review." *Id.* ¶ 11 (quoting *State v. Ross*, 1996–NMSC–031, 122 N.M. 15, 22, 919 P.2d 1080, 1087) (internal quotation marks omitted).

{13} At trial, Defendant objected to the admission of Ortiz's taped statement on general impeachment and hearsay grounds. However, he did not object to the admission

of this evidence on confrontation grounds, nor did he raise or allude to any general constitutional violations which would occur as a result of its admission. As a result, we do not address Defendant's confrontation concerns on appeal. *See State v. Mora*, 1997–NMSC–060, ¶ 47 n. 1, 124 N.M. 346, 950 P.2d 789 (finding that defendant did not preserve the confrontation issue for appellate review because he "did not timely object to the admission of [the deceased witness's] statement on confrontation grounds, nor did he timely object on general constitutional grounds"); *cf. Lopez*, 2000–NMSC–003, ¶¶ 9–21, 128 N.M. 410, 993 P.2d 727 (reviewing defendant's confrontation concerns after determining that the confrontation issue had been preserved at trial because defendant objected to his inability to cross examine or confront the witness).

### B.

■ {14} At trial, the State called Ortiz as an eyewitness to testify regarding the details of the shooting. On the stand Ortiz stated that he could not recall the particular details of the crime. The prosecutor then requested that the court allow him to play for the jury the tape of Ortiz's July 3rd statement to Detective Shawn in which Ortiz gave a more detailed account of the events. Defendant objected to the tape being played to the jury, claiming that this was improper impeachment and inadmissible hearsay under Rules 11–613(B), 11–803(E), 11–801(D)(1)(c), 11–804(A)(3), and 11–803(X) NMRA 2002. Despite Defendant's objections, the court admitted the evidence pursuant to Rules 11–803(E), 11–803(X), 11–804(A)(3), and 11–612 NMRA 2002.

■ {15} As a general rule, the "[a]dmission of evidence is entrusted to the discretion of the trial court, and rulings of the trial judge will not be disturbed absent a clear abuse of discretion."[2] *State v. Worley*, 100

---

2. The dissent agrees that as a general matter we should defer to the discretion of the trial judge on evidentiary matters, but argues that "[s]uch deference ... has less force in this case, where it is less than clear from the record that the trial court relied upon Rule 11–803(X) in its ruling." Dissent ¶ 80. We think the record makes clear

that the trial judge relied on Rule 11–803(X), even though it may not have been the cornerstone of its ruling. The dissent cites to no authority to support its conclusion that less deference is due when the trial court admits evidence under a rule that it did not principally rely on, and without some contrary authority, we believe

N.M. 720, 723, 676 P.2d 247, 250 (1984); *see also Lopez*, 2000–NMSC–003, ¶ 10, 128 N.M. 410, 993 P.2d 727; *State v. Torres*, 1998–NMSC–052, ¶ 15, 126 N.M. 477, 971 P.2d 1267; *State v. Stout*, 96 N.M. 29, 32, 627 P.2d 871, 874 (1981). In order to find that the trial court abused its discretion in admitting the tape and transcript of Ortiz's interview with Detective Shawn, we must conclude that the trial court's decision was " 'obviously erroneous, arbitrary or unwarranted.' " *State v. Brown*, 1998–NMSC–037, ¶ 39, 126 N.M. 338, 969 P.2d 313 (quoting *State v. Stills*, 1998–NMSC–009, ¶ 33, 125 N.M. 66, 957 P.2d 51).

■ {16} The trial court found the statement admissible under Rule 11–803(X), and we conclude that it did not abuse its discretion by admitting Ortiz's statement under this Rule. Rule 11–803(X) allows hearsay statements to be admitted if not specifically covered by any other hearsay exception so long as there are "equivalent circumstantial guarantees of trustworthiness" and the court determines that:

(1) the statement is offered as evidence of a material fact;

(2) the statement is more probative on the point for which it is offered than any other evidence which the proponent can procure through reasonable efforts; and

(3) the general purposes of these rules and the interests of justice will best be served by admission of the statement into evidence.

*Id.* The dissent argues that our analysis under Rule 11–803(X) is misplaced because this exception " 'cannot be read to mean that hearsay which almost, but not quite, fits another specific exception, may be admitted under the 'other exceptions' subsection . . . .' " Dissent ¶ 82 (quoting *State v. Barela*, 97 N.M. 723, 726, 643 P.2d 287, 290 (Ct.App. 1982)). Rather, the dissent urges, the rule "should be used in a novel situation not considered by the drafters and not 'specifically covered by any of the foregoing exceptions . . . .' It should not be used when the

statement is of a type expressly considered by other exceptions, but which does not satisfy the rules those exceptions establish." *Id.* This narrow interpretation of the rule has been rejected by a majority of circuits, and we decline to adopt it in our jurisdiction. *See* 5 Jack B. Weinstein & Margaret A. Berger, *Weinsteins's Federal Evidence* § 807.03[4], at 807–26 (Joseph M. McLaughlin ed., 2d ed. 2001) ("Although there was initially some debate about the meaning of this phrase, ['not specifically covered by any of the foregoing exceptions,'] the majority of circuits have concluded that the phrase means only that, if a statement is *admissible* under one of the hearsay exceptions, that exception should be relied on instead of the residual exception. If a hearsay statement is similar to those defined by a specific exception but does not actually qualify for admission under that exception, these courts allow the statement to be considered for admission under the residual exception."). While we agree that the rule cannot be used to supply the missing elements to admit evidence which almost, but not quite, meets the requirements of another specific exception, it can be used to admit out-of-court statements that otherwise bear indicia of trustworthiness equivalent to those other specific exceptions. In other words, "if a statement is inadmissible under a prior hearsay exception, the statement may nonetheless be considered for admission under the catch-all exception." *United States v. Earles*, 113 F.3d 796, 800 (8th Cir.1997). If we were to adopt the dissent's reading of this rule, we would deprive the jury of reliable probative evidence relevant to the jury's truth-seeking role. Accordingly, we respectfully disagree with the dissent's reasoning on this point.

■ {17} "In determining whether a statement is sufficiently trustworthy the statement must be inherently reliable at the time it is made." *State v. Williams*, 117 N.M. 551, 561, 874 P.2d 12, 22 (1994). "The test under the catch-all rules is whether the out-of-court statement—not the witness's

we are obligated to review the trial court's ruling under the well-established abuse of discretion standard. *See State v. Salgado*, 1999–NMSC–008, ¶¶ 5–11, 126 N.M. 691, 974 P.2d 661; *see*

*also State v. Beachum*, 83 N.M. 526, 527, 494 P.2d 188, 189 (Ct.App.1972) ("A decision of the trial court will be upheld if it is right for any reason.").

testimony—has circumstantial guarantees of trustworthiness."[3] *Id.* This Court has recognized four primary dangers of hearsay which can potentially make a hearsay statement unreliable.

They are:

(1) Ambiguity—the danger that the meaning intended by the declarant will be misinterpreted by the witness and hence the jury; (2) Lack of candor—the danger the declarant will consciously lie; (3) Faulty memory—the danger that the declarant simply forgets key material; and (4) Misperception—the danger that the declarant misjudged, misinterpreted, or misunderstood what he saw.

*Id.* at 560, 874 P.2d at 21 (quoting *State v. Taylor,* 103 N.M. 189, 197, 704 P.2d 443, 451 (Ct.App.1985)).

{18} With respect to ambiguity, we conclude that there is no danger that the meaning intended by Ortiz will be misinterpreted because the taped statement was played to the jury and the jury had the opportunity to interpret Ortiz's statement themselves rather than rely on some other witness's interpretation. As to lack of candor, we find the fact that Ortiz was not a suspect in the shooting and therefore had no reason to shift blame away from himself, the fact that he implicated his own cousin, Allison, in his statement, and the fact that he likely placed himself and his family in grave danger by giving Detective Shawn a physical description of the shooters, make it less likely that Ortiz would have consciously lied to Detective Shawn about what he observed that night. Similarly, the danger that Ortiz might have a faulty memory is not present here, because Ortiz gave his statement just hours after the shooting. Finally, we find there was little danger that Ortiz misjudged, misinterpreted, or misunderstood what he saw that evening because there were no impediments to his perception and because he was present throughout the event.

{19} The dissent concludes that with respect to the second danger, lack of candor, Ortiz did in fact have a motive to lie and "therefore his statement lacked circumstantial guarantees and was inherently untrustworthy." Dissent ¶ 74. The essence of the dissent's argument on this point is that while one could reason that Ortiz would not have implicated a family member unless he believed it to be true, equally one could reason that he had a motive to shift the blame from his cousin to Defendant because of familial loyalty, fear of retaliation, and his presumed belief that his cousin would be less culpable. Dissent ¶¶ 75–78. However, this argument does not adequately take into account the fact that Ortiz did not have to implicate his cousin at all. Furthermore, even if Ortiz had believed that his cousin would be less culpable had he not fired the fatal shots, one could also speculate that he would have believed his cousin to be even less culpable had he not fired *any* shots. While we agree that the subjective beliefs of the declarant about legal culpability can be relevant in determining the admissibility of hearsay, *see Torres,* 1998–NMSC–052, ¶ 18, 126 N.M. 477, 971 P.2d 1267, Ortiz never testified as to what his subjective beliefs were and we refuse to engage in speculation on that point. *See id.*

{20} Turning to the other three criteria required by the Rule, first, the statement was offered as evidence of a material fact—the identity of the shooters. Second, the statement was more probative of the identity of the shooters than any other evidence the

---

**3.** The dissent notes that the statement lacks circumstantial guarantees of trustworthiness because Detective Shawn, the "person in the best position to gauge the candor of the out of court statement" felt that Ortiz was lying to him. Dissent ¶ 79. We respectfully believe this conclusion is unfounded. First, the dissent's discussion suggests that Detective Shawn found Ortiz's statement generally untruthful. However, Detective Shawn testified that he believed Ortiz was generally telling the truth, but that he was withholding the actual names of the shooters and was only willing to give a physical description of them. Furthermore, Detective Shawn also testified that he believed Ortiz's statement was truthful because it was consistent with other witnesses' testimony and the physical evidence found at the scene. In any event, we do not agree that Detective Shawn is the person in the best position to gauge the candor of Ortiz's statement. It is the court's duty to determine preliminary questions concerning the admissibility of evidence, *see* Rule 11–104(A) NMRA 2002, and this Court reviews the trial court's rulings for an abuse of discretion. *See Lopez,* 2000–NMSC–003, ¶ 10, 128 N.M. 410, 993 P.2d 727.

State could procure through reasonable efforts—in Ortiz's taped statement he indicated that there was a "big guy" wearing black jeans and a black t-shirt, presumably Allison, and a "little guy" wearing light blue jeans and a striped shirt, presumably Defendant, on the balcony and that the "little guy" did the shooting. However, at trial, after Ortiz had time to appreciate the danger of gang retaliation, and after testifying that it was unacceptable to "rat out" a gang member and that he or one of his family members could be killed for it, Ortiz changed his story and repeatedly stated that he could not recall the details of the shooting on July 3rd, which made the taped statement the most probative evidence on this point that could be procured through reasonable efforts. Finally, the general purposes of these rules and the interests of justice will best be served by the admission of Ortiz's taped statement into evidence, as the circumstances surrounding the statement indicate trustworthiness equivalent to evidence admitted under the other hearsay exceptions.

{21} Under these circumstances, we find that the taped statement and transcript were reliable and important for the jury to consider, as it went to the identity of the shooters. Furthermore, Ortiz was present and available for cross-examination, which meant the jury could observe his demeanor and make its own determinations regarding Ortiz's credibility. *See State v. Sanchez,* 112 N.M. 59, 65, 811 P.2d 92, 98 (Ct.App.1991) ("In ruling upon the admissibility of the statement the trial court does not determine the ultimate questions of the declarant's credibility; instead, this is the province of the jury"); *see also* UJI 14–5020 NMRA 2002. We also note that in a recent opinion this Court unanimously concluded that the district court, under the same exact facts, did not abuse its discretion by admitting Ortiz's prior statement under Rule 11–803(X). *State v. Allison,* 2000–NMSC–027, ¶¶ 27–31, 129 N.M. 566, 11 P.3d 141. Although we did not have an extensive analysis on this issue and we noted that the defendant did not persuade us otherwise, we recognized that the district "court found 'that the circumstances of the original statement, the proximity in time to the shooting itself, all are indicia of reliability

in that statement.' " *Id.* ¶ 27. Based on these facts, we find that there are equivalent circumstantial guarantees of trustworthiness to make this statement admissible under Rule 11–803(X) and conclude that the trial court's determination that the evidence was admissible was not erroneous, arbitrary, or unwarranted. We therefore hold that the trial court did not abuse its discretion by admitting the tape and transcript into evidence under Rule 11–803(X).

**IV.**

{22} Defendant next argues that insufficient evidence supports his conviction for first-degree depraved-mind murder on either a principal or accessory liability theory. Defendant argues that the only evidence presented at trial suggesting that he was the one who shot directly at Mendez was improperly before the court and that no evidence supports the finding that Defendant intended that Allison shoot Mendez or that he encouraged him to shoot. We are unpersuaded by Defendant's arguments and find that there was sufficient evidence at trial to convict Defendant of first-degree depraved-mind murder.

{23} Under a sufficiency of the evidence analysis, we must first determine "whether substantial evidence of either a direct or circumstantial nature exists to support a verdict of guilt beyond a reasonable doubt with respect to every element essential to a conviction." *State v. Sutphin,* 107 N.M. 126, 131, 753 P.2d 1314, 1319 (1988). "A reviewing court must view the evidence in the light most favorable to the state, resolving all conflicts therein and indulging all permissible inferences therefrom in favor of the verdict." *Id.; see also State v. Lankford,* 92 N.M. 1, 2, 582 P.2d 378, 379 (1978). The appellate court has a duty "to determine whether *any* rational jury could have found each element of the crime to be established beyond a reasonable doubt." *State v. Garcia,* 114 N.M. 269, 274, 837 P.2d 862, 867 (1992). "[W]here a jury verdict in a criminal case is supported by substantial evidence, the verdict will not be disturbed on appeal."

**720**

*State v. Anaya,* 98 N.M. 211, 212, 647 P.2d 413, 414 (1982).

{24} Depraved-mind murder is "the killing of one human being by another without lawful justification or excuse, by any of the means with which death may be caused ... by any act greatly dangerous to the lives of others, indicating a depraved mind regardless of human life." Section 30–2–1(A)(3). In order to convict Defendant of this offense, the State had to prove beyond a reasonable doubt that Defendant committed the crime of depraved-mind murder either as a principal or an accessory. We find there was sufficient evidence to convict Defendant of first-degree depraved-mind murder on either of these theories.

### A.

{25} In order to convict Defendant of first-degree depraved-mind murder as a principal, the state had to prove beyond a reasonable doubt each of the following elements of the crime:

(1) The defendant discharged a firearm several times from the balcony of an apartment dwelling;

(2) The defendant's act caused the death of Javier Mendez;

(3) The act of the defendant was greatly dangerous to the lives of others, indicating a depraved mind without regard for human life;

(4) The defendant knew that his act was greatly dangerous to the lives of others;

(5) This happened in New Mexico on or about the 3rd day of July, 1997

*See* UJI 14–203 NMRA 2002. Because causation was at issue here, the jury was also instructed that:

The cause of death is an act which, in a natural and continuous chain of events, produces the death and without which the death would not have occurred. There may be more than one cause of death. If the acts of two or more persons contribute to cause death, each such act is a cause of death.

*See* UJI 14–251 NMRA 2002.

{26} Defendant does not dispute that the act of shooting from the second floor balcony into a group of people was an act greatly dangerous to the lives of others. Defendant also does not dispute that he knew this act was greatly dangerous to the lives of others. Rather, relying on *State v. Hernandez,* 117 N.M. 497, 873 P.2d 243 (1994), Defendant argues that the State failed to prove that his actions caused Mendez's death, therefore failing to meet its burden as to the causation requirement.

{27} Defendant's reliance on *Hernandez* is misplaced. In that case, we found that the defendant's depraved-mind acts of shooting toward two people at two different times were distinguishable and separate from the shot which actually killed the victim. *See id.* at 499, 873 P.2d at 245. The Court stated that "[t]he attempt to disarm [d]efendant, the elapse of time between the initial random shooting and the shot fired during the struggle, the apparent change in [d]efendant's intent when he stopped the random shooting and returned to his house, all lead us to conclude there was no evidence that [d]efendant's initial depraved-mind action caused the victim's death." *Id.* (emphasis omitted). None of those factors is present in this case. There is no question that Mendez's death was caused by a depraved-mind act, the hail of bullets from the balcony. The only question for the jury was who was responsible for the bullets that struck and killed him.

{28} At trial, the evidence showed that Defendant and Allison were standing on the second floor balcony and opened fire at a group of rival gang members below. According to Ortiz, Defendant shot at Mendez first and then let Allison shoot Canas and Ortega. Detective Shawn testified that Ortiz identified Defendant from a photo lineup as one of the shooters, but refused to have his response recorded on tape. Ortega testified that Allison shot at Mendez first and then Defendant took the gun from Allison and shot at the other two. He also identified Defendant as one of the shooters from a photo lineup performed by Detective Shawn

and again positively identified Defendant as one of the shooters at trial. It is true that the evidence tends to align itself with two different factual conclusions—that either Defendant or Allison shot and killed Mendez. We agree with the Court in *State v. Ortiz–Burciaga*, 1999–NMCA–146, ¶ 22, 128 N.M. 382, 993 P.2d 96, however, that under a substantial evidence review, "[i]t is the 'exclusive province of the jury' to resolve factual inconsistencies in testimony." We will not reweigh the evidence or substitute our judgment for that of the jury. *See Sutphin*, 107 N.M. at 131, 753 P.2d at 1319. We conclude that a rational jury could find, from this testimony, that beyond a reasonable doubt Defendant's act of shooting into the crowd caused Mendez's death.

### B.

{29} Defendant may also have been convicted of first-degree depraved-mind murder as an accessory to the crime. In order to convict Defendant on this theory, the State had to prove that, even though Defendant did not commit the acts constituting the crime himself:

1. The defendant intended that the crime be committed;

2. The crime was committed; [and]

3. The defendant helped, encouraged or caused the crime to be committed.

UJI 14–2822 NMRA 2002. Defendant argues there is insufficient evidence to establish elements one and three beyond a reasonable doubt—that Defendant intended for Allison to shoot and kill Mendez and that Defendant helped or encouraged him to do it. Defendant maintains that the only testimony regarding the sequence of events surrounding the shooting was from Ortega who testified that Allison shot at Mendez multiple times before Defendant took the gun and shot towards Canas and Ortega. Defendant argues that "Javier, presumably, had long since turned and run, and in all likelihood had already been hit by the fatal bullet" when Defendant began shooting. He also asserts that no evidence showed that Defendant knew anything about Allison's intentions or that he encouraged Allison to shoot Mendez. Defendant argues that mere pres-

ence during the commission of the crime is not enough, but rather some outward manifestation of approval is necessary to show that Defendant shared Allison's purpose or intent.

{30} In *State v. Baca*, 1997–NMSC–059, ¶ 15, 124 N.M. 333, 950 P.2d 776, we concluded that in order to find the defendant guilty as an accessory to first-degree depraved-mind murder the State was required to show, "either through direct or circumstantial evidence, that [the principal] committed 'an act greatly dangerous to the lives of others indicating a depraved mind without regard for human life' . . . and also that [the accomplice] 'helped, encouraged or caused' [the principal's] act, intending that the crime occur." *Id.* (citations omitted). Based on the evidence summarized below, we conclude the State met its evidentiary burden. There is sufficient evidence to support findings that (1) Allison committed an act greatly dangerous to the lives of others, (2) knowing that the act created a risk of death or great bodily harm, which indicated a depraved-mind, without regard for the lives of others, (3) that Defendant helped him commit that act, and (4) that Defendant shared Allison's purpose or design.

{31} Ortega testified at trial that he and fellow Juaritos Maravilla gang members were asked what they were doing in the Barelas barrio by people standing on a second-floor apartment balcony. He stated that Mendez answered, "We could be anywhere we want, Juaritos," and immediately thereafter shots were fired down at them from the balcony. As discussed above, there was conflicting testimony about who shot first, Allison or Defendant. However, both Ortega and Ortiz indicated that one of the two men shot first at Mendez and then the other immediately shot at Ortega and Canas. Furthermore, both identified Defendant as one of the shooters from a photo lineup shown to them by Detective Shawn the night of the shooting. Regardless of who shot first, the evidence clearly supports an inference that Defendant helped, encouraged, caused, and intended that the shooting be committed. Defendant's action of taking the gun from Allison to continue the shooting is clear evi-

dence of accessory liability. The fact finder "can reject the defendant's version of an incident." *State v. Vigil*, 87 N.M. 345, 350, 533 P.2d 578, 583 (1975). We are not persuaded that Defendant was merely present during the shooting. We find that there was sufficient evidence for a rational jury to find beyond a reasonable doubt that Defendant helped, encouraged, caused, and intended the shooting which resulted in Mendez's death.

{32} Defendant is liable for the crime of first-degree depraved-mind murder whether or not he fired the fatal shot. It appears that in this case the jury rejected Defendant's version of the incident, and we will not substitute our judgment for that of the jury. We hold that sufficient evidence exists. to affirm Defendant's conviction of first-degree depraved-mind murder on either a principal or accessory liability theory.

## V.

{33} Defendant was charged and convicted of conspiracy to commit a first-degree depraved-mind murder. The State concedes that this conviction must be vacated because this Court has explicitly held that this is not a cognizable crime in New Mexico. We agree. *See Baca*, 1997–NMSC–059, ¶ 51, 124 N.M. 333, 950 P.2d 776 (holding that a conviction for conspiracy to commit first-degree depraved-mind murder could not stand under current case law because conspiracy requires both intent to agree and intent to commit the offense which is the object of the conspiracy and depraved-mind murder is an unintentional killing resulting from highly reckless behavior); *cf. State v. Varela*, 1999–NMSC–045, ¶ 42, 128 N.M. 454, 993 P.2d 1280 (refusing to extend *Baca's* holding to prohibit the conviction of conspiracy to commit shooting at a dwelling which requires willful, rather than reckless, behavior). Accordingly, we vacate Defendant's conviction and accompanying nine-year concurrent prison sentence for this crime.

## VI.

{34} Defendant next argues that his convictions for all counts relating to shooting at a dwelling or occupied building must be reversed because there was no evidence that Defendant shot at a dwelling or occupied building. He asserts that there was no evidence from any witness that any of the shots were directed at any building or that any bullets hit a building. The State asserts without discussion, and without citing to any evidence in the record, that Defendant "willfully discharged the gun at an occupied apartment building." Viewing the evidence in the light most favorable to the State, resolving all conflicts and indulging all permissible inferences to uphold a verdict of conviction, we find that there was no evidence to support the jury's conclusion that Defendant shot at a dwelling or occupied building. *See Garcia*, 114 N.M. at 274, 837 P.2d at 867.

{35} "Shooting at a dwelling or occupied building consists of willfully discharging a firearm *at* a dwelling or occupied building." Section 30–3–8(A) (emphasis added). In order to find the Defendant guilty, the State had to prove beyond a reasonable doubt that Defendant willfully shot a firearm at a dwelling or an occupied building. *See* UJI 14–340 NMRA 2002. The evidence at trial revealed that shots were fired from an apartment balcony downward into a courtyard area. Necessarily, there were other apartment buildings in the vicinity. Nevertheless, the State put forth no evidence from which the jury could infer that any of the shots from any shooter were directed *at* or hit any building, nor did it cite to any in its briefing to this Court. Ortega testified that the shots were first directed at Mendez, and then at himself and Canas. He gave no testimony that shots were fired in any direction other than towards the four men standing at ground level. Della Gonzales also testified that she heard the noise of the bullets from a nearby apartment but that she did not hear the noise of bullets striking a surface or building. Detective J.D. Herrera stated that his findings were consistent with other physical evidence that tended to demonstrate that the shots were fired only downward. There was nothing in his statement that indicated that any of the shots had been fired at any building.

{36} It is the absence of evidence on this point that convinces us that Defendant did

not willfully discharge the gun at a dwelling or occupied building or agree with another person to commit such a crime. We therefore reverse Defendant's convictions for conspiracy to commit shooting at a dwelling or occupied building (great bodily harm), conspiracy to commit shooting at a dwelling or occupied building (resulting in injury), shooting at a dwelling or occupied building (no injury), and conspiracy to commit shooting at a dwelling or occupied building (no injury).

## VII.

{37} Defendant claims that he received ineffective assistance of counsel at every stage of the trial proceedings. He asserts that defense counsel's performance, viewed cumulatively, fell below that of a reasonably competent attorney and prejudiced his defense. We review each of Defendant's allegations of ineffective assistance of counsel individually in addition to considering their cumulative effect.

{38} Defendant has the burden of showing ineffective assistance of counsel. *See Baca*, 1997–NMSC–059, ¶ 24, 124 N.M. 333, 950 P.2d 776. "Assistance of counsel is presumed effective unless the defendant demonstrates both that counsel was not reasonably competent and that counsel's incompetence caused the defendant prejudice." *State v. Gonzales*, 113 N.M. 221, 229–30, 824 P.2d 1023, 1031–32 (1992). "[T]o establish ineffective assistance of counsel, the defendant must point to specific lapses . . . by trial counsel." *State v. Brazeal*, 109 N.M. 752, 757, 790 P.2d 1033, 1038 (Ct.App.1990). "The court must then determine whether, in light of all the circumstances, the identified acts or omissions were outside the wide range of professionally competent assistance." *Strickland v. Washington*, 466 U.S. 668, 690, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984). However, "[a]n error by counsel, even if professionally unreasonable, does not warrant setting aside the judgment of a criminal proceeding if the error had no effect on the judgment." *Id.* at 691, 104 S.Ct. 2052. Accordingly, "defendant must still affirmatively prove prejudice. In other words, '[t]he defendant must show that there is a reasonable probability that, but for counsel's unpro-

fessional errors, the result of the proceeding would have been different.' " *Brazeal*, 109 N.M. at 757–58, 790 P.2d at 1038–39 (quoting *Strickland*, 466 U.S. at 694, 104 S.Ct. 2052) (internal citation omitted).

{39} Defendant claims that the following flaws in defense counsel's performance resulted in ineffective assistance: counsel was unprepared to start trial, he failed to review jury questionnaires prior to jury selection, he failed to complete his interview with Ortega, he failed to interview, secure the presence of, or secure a continuance until such time as Canas could be located, he failed to object to prejudicial hearsay statements, he elicited highly prejudicial evidence against his own client, and he failed to challenge an indictment for a nonexistent crime. Even assuming competent counsel would not have performed in such a manner, we do not find the necessary prejudice.

{40} Defendant first argues that even the State in this case acknowledged from the outset that his counsel was ineffective, stating: "What you have here is ineffectiveness of counsel crusading as someone who wants to disqualify me from participation in this case. He is not prepared to proceed today, Your Honor." This comment was apparently made by the prosecutor in response to defense counsel's request for a one-day continuance. This comment must be considered in the context in which it was made; it occurred during a heated exchange between the defense attorney and the prosecutor, in which defense counsel informed the court that the prosecutor had committed an assault and battery on him by removing his eyeglasses from his face during a witness interview. Defense counsel requested the continuance because he claimed that he was so upset by the incident that he felt he could not proceed that day. While we remind counsel of their obligations of civility and professionalism under the Rules of Professional Conduct, *see e.g.*, Rule 16–804 NMRA 2002, we are not persuaded that this incident, or the trial judge's denial of the request for a continuance, resulted in prejudice to the Defendant. Furthermore, just because the prosecutor thought defense counsel to be ineffective does not make it so.

{41} Defendant next argues that his trial counsel failed to review jury questionnaires prior to jury selection. While counsel admitted at the November 9, 1998 hearing that he had not picked up those questionnaires, he specifically referred to them during voir dire, indicating that he had reviewed them. Counsel may not have had as much time to review the jury questionnaires as he would have liked, but the record indicates that he in fact conducted a thoughtful voir dire in which he engaged in an active discussion with the panel. Defendant has identified no prejudice resulting from any lack of preparedness, nor do we find any.

{42} Defendant also claims that his attorney failed to complete his interview with Ortega. Defense counsel told the court that he was not aware that Ortega and Canas had been arrested on material witness warrants until some time after the two had been arrested, but that he and the prosecutor did conduct an interview with Ortega which eventually broke down due to animosity between the lawyers. It is evident from the record that the trial judge recognized that the defense attorney had not completed his interviews at that point and made some arrangement for him to complete them prior to opening statements. Although it appears that defense counsel did not interview Ortega prior to opening statements, the court noted that it would allow counsel to finish interviewing him before he took the stand. It seems clear from the record that defense counsel did interview Ortega, as indicated by the trial judge's statement: "In reference to the interview, that I'm not so much concerned about because that was conducted out of the presence of the jury and the interview, at least with Mr. Ortega, happened." We find nothing in the record to indicate that defense counsel did not avail himself of this opportunity.

{43} Defendant also claims his trial attorney failed to question Ortega about his alleged statement to his friend Juan Landaras on the night of the shooting, that a third person, Little Guero, not Defendant, was the shooter and that counsel failed to challenge Ortega's conflicting identifications of the shooters. However, during cross-examina-

tion, defense counsel questioned Detective Shawn about Ortega's alleged statement to Landaras, specifically attacking his failure to follow-up on this information known by one of his detectives, Detective Martinez. Counsel's failure to ask Ortega about this alleged inconsistent identification could have been a rational trial strategy. If counsel had questioned Ortega about this statement on the stand and he had denied making it, Defendant's theory of the case could have been weakened. However, by bringing this evidence in through Detective Shawn, Defendant was able to argue that the police did an inadequate investigation, potentially leaving the jury with reasonable doubt as to the identification of the shooters. As noted in *State v. Swavola*, 114 N.M. 472, 475, 840 P.2d 1238, 1241 (Ct.App.1992), "a prima facie case [of ineffective assistance] is not made when a plausible, rational strategy or tactic can explain the conduct of defense counsel." We find that defense counsel's failure to question Ortega about his alleged statements to Landaras and his failure to challenge his conflicting identifications can be explained as a rational trial strategy and therefore conclude that defense counsel was acting with reasonable competence, and, in any event, did not prejudice Defendant's case.

{44} We next consider Defendant's argument that defense counsel was ineffective in failing to interview, secure the presence of, or secure a continuance until such time as Canas could be located. Defendant supports his argument with his counsel's own statement, "If I would have been able to interview Jesus, put him under oath, we could have had a statement here ... So I've been thwarted in that." As noted above, Canas and Ortega were arrested and brought in on material witness warrants shortly before trial. However, the court then released the two men, unsure of its authority to keep holding them in detention. Defense counsel was apparently not timely informed that they had been brought in and, therefore, did not have an opportunity to interview them at that time. At the start of trial a week later, Canas did not appear in court, and it was later learned that he had apparently fled to Colorado. During his argument to the court,

defense counsel discussed what Canas had told Detective Shawn and argued that Canas' statement that the shooter was "bald" was exculpatory because his client had short hair. Defense counsel also argued that the "issue about baldness and shortness and so forth could have been used to the defendant's advantage as to who was actually doing the shooting." However, in addition to arguing that portions of Canas' statement were exculpatory, defense counsel acknowledged that portions of his statement were inculpatory. Defense counsel also did not dispute the accuracy of the following statement argued to the court by the State:

I would also say in the interviews Mr. DeVoe [co-defendant Charlie Allison's counsel] conducted with Mr. Huero [sic] and Mr. Canas, Mr. DeVoe showed the two photo arrays of Allison and Trujillo to Iguado [Ortega] and Canas and they reaffirmed their identification of both defendants at Mr. DeVoe's request.

Moreover, Defendant did not demonstrate that had his counsel moved for a continuance until Canas could be located, the motion would have been granted. *See e.g., Gonzales,* 113 N.M. at 230, 824 P.2d at 1032 (finding that in order to prevail on his ineffective assistance of counsel claim, defendant had to first demonstrate that had his counsel moved for severance, the motion would have been granted). Thus, even though he failed to interview, secure the presence of, or secure a continuance until Canas could be located, it appears undisputed that at least portions of Canas' testimony would have been highly inculpatory, and we are not persuaded that his testimony would have been sufficiently exculpatory to result in an acquittal.

{45} Defendant also argues that defense counsel failed to object to prejudicial hearsay statements and elicited highly prejudicial evidence against his own client. He claims that the testimony came out during defense counsel's examination of Detective Shawn, during which defense counsel asked Shawn an open-ended question about one of his interviews. The Detective responded that "Silly tried to sell him a gun, a .25 caliber." Defense counsel moved on with other questions and then moved for a mistri-

al, or in the alternative, for a curative instruction, after the jury was dismissed for the day, arguing that the statement was overly prejudicial. The trial judge denied both motions and made the following finding:

First of all, I don't think very many jurors heard it. Second of all, I think it would be to your disadvantage for me to reiterate what it was because then they will really focus on the fact that he allegedly was buying a handgun. So I'm going to leave it alone. And I've instructed the State that that did not open the door and I don't want that pursued, but that's as far as I'm going to go. I think you are stuck with the strategy there.

We find no evidence to suggest that defense counsel purposely elicited the Detective's answer, or could have known it was coming. Moreover, counsel did not draw the jury's attention to it, and it was not repeated by counsel or the prosecutor. Although the statement may have had some prejudicial effect, Defendant has not demonstrated that had this statement not come in, the result of the proceeding would have been different.

{46} Finally, Defendant argues that defense counsel's failure to challenge the indictment for conspiracy to commit depraved-mind murder, a non-existent crime, constituted per se ineffectiveness. We disagree. Defendant was charged with conspiracy to commit depraved-mind murder on July 22, 1997. On November 13, 1997, this Court filed its opinion in *Baca,* 1997–NMSC–059, ¶ 51, 124 N.M. 333, 950 P.2d 776, holding that conspiracy to commit depraved-mind murder is not a cognizable crime in New Mexico. Defendant's case did not go to trial until November 9, 1998, leaving counsel nearly a year to challenge the indictment for this crime. Certainly counsel's failure to challenge this indictment prejudiced Defendant as to his conviction for this crime. However, this conviction has been vacated, and Defendant has not demonstrated that had he timely challenged this indictment he would have been acquitted of his other convictions. Thus, even assuming a reasonably competent attorney would have timely objected, Defendant has not demonstrated that " 'but for counsel's unprofessional errors, the result of the

proceeding would have been different.' " *Brazeal,* 109 N.M. at 757–58, 790 P.2d at 1038–39 (quoting *Strickland,* 466 U.S. at 694, 104 S.Ct. 2052).

{47} We consider the entire proceeding as a whole and judge any claim of ineffectiveness on " 'whether counsel's conduct so undermined the proper functioning of the adversarial process that the trial cannot be relied on as having produced a just result.' " *State v. Richardson,* 114 N.M. 725, 727, 845 P.2d 819, 821 (Ct.App.1992) (quoting *Strickland,* 466 U.S. at 686, 104 S.Ct. 2052). We conclude that the alleged failings of counsel in this case do not result in ineffective assistance of counsel regardless of whether they are considered individually or cumulatively.

## VIII.

{48} We next address Defendant's argument that the prosecutor engaged in prosecutorial misconduct that deprived him of a fair trial. Defendant asserts that the prosecutor's failure to disclose material evidence to the defense, improper use of leading questions, improper introduction of hearsay evidence, use of inflammatory and irrelevant evidence, and improper argument, distorted the evidence on the crucial issue of identification. We review each of Defendant's allegations of prosecutorial misconduct individually in addition to considering their cumulative effect. We conclude, however, that the alleged instances of prosecutorial misconduct in this case do not rise to the level of reversible or fundamental error regardless of whether they are considered individually or cumulatively.

## A.

{49} When an issue of prosecutorial misconduct is properly preserved by a timely objection at trial, we review the trial court's ruling on this issue under the deferential abuse of discretion standard because the "trial court is in the best position to evaluate the significance of any alleged prosecutorial errors." *State v. Duffy,* 1998–NMSC–014, ¶ 46, 126 N.M. 132, 967 P.2d 807. "The trial court's determination of these questions will not be disturbed unless its ruling is arbitrary, capricious, or beyond rea-

son." *Id.* Our resolution of this issue "rests on whether the prosecutor's improprieties had such a persuasive and prejudicial effect on the jury's verdict that the defendant was deprived of a fair trial." *Id.*

{50} Defendant first argues that the prosecutor engaged in misconduct by failing to disclose material evidence to the defense. Defendant properly preserved this issue by a timely objection at trial. Defense counsel, in a motion to dismiss for prosecutorial misconduct, alleged two instances in which the State failed to provide material evidence to the defense. Defendant first alleged that the State failed to provide accurate "rap sheets" on Ortega and Mendez, stating that neither record showed that the two men had a criminal history even though testimony presented at trial indicated that both had previously been in Springer Boys Home or the "D home." Defendant also claimed that the State failed to provide a July booking photo taken of Defendant shortly after his arrest. The State has an affirmative duty to disclose "any material evidence favorable to the defendant which the state is required to produce under the due process clause of the United States Constitution." Rule 5–501(A)(6) NMRA 2002. The United States Supreme Court has held that "the suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution." *Brady v. Maryland,* 373 U.S. 83, 87, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963). However, "[e]vidence is material under *Brady* 'only if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different.' " *State v. Baca,* 115 N.M. 536, 541, 854 P.2d 363, 368 (Ct.App. 1993) (quoting *United States v. Bagley,* 473 U.S. 667, 682, 105 S.Ct. 3375, 87 L.Ed.2d 481 (1985)). In our analysis,

we must avoid concentrating on the suppressed evidence in isolation. Rather, we must place it in the context of the entire record. Evidence that may first appear to be quite compelling when considered alone

can lose its potency when weighed and measured with all the other evidence, both inculpatory and exculpatory. Implicit in the standard of materiality is the notion that the significance of any particular bit of evidence can only be determined by comparison to the rest.

*Trujillo v. Sullivan*, 815 F.2d 597, 613 (10th Cir.1987).

{51} The trial judge denied Defendant's motion to dismiss on the basis that it came down to a "swearing match" between the two attorneys and she found no prejudice to the Defendant. We do not find the trial court's decision to be arbitrary, capricious, or beyond reason. The court indicated that as to the identity of the shooter, Defendant was not prejudiced because Canas could have testified that the shooter was bald, "but at the same time he may have elicited information that that bald person's name was Silly [Defendant's alias]. It could have gone ... either way, and again, the prejudice to the defendant, I just don't see it." We agree that viewed in the context of the entire record, there is nothing to indicate that had the July booking photograph been disclosed, the result of the proceeding would have been different. We are also not persuaded that had the defense attorney received the requested rap sheets that contained Ortega's and Mendez's juvenile history, any difference in the outcome would have resulted. While the prosecutor cannot hide information behind other arms of the State, *see Kyles v. Whitley*, 514 U.S. 419, 437, 115 S.Ct. 1555, 131 L.Ed.2d 490 (1995), Defendant had knowledge of these two men's juvenile records and has not demonstrated any prejudice which resulted from the State's failure to provide that information. Accordingly, we find that the trial court did not abuse its discretion when it denied Defendant's motion to dismiss for prosecutorial misconduct based on these two discovery violations.

### B.

{52} When an issue has not been properly preserved by a timely objection at trial, we have discretion to review the claim on appeal for fundamental error. Rule 12–216(B)(2) NMRA 2002 ("This [preservation] rule shall not preclude the appellate court from considering ... in its discretion, questions involving: ... fundamental error or fundamental rights of a party."); *see State v. Allen*, 2000–NMSC–002, ¶ 95, 128 N.M. 482, 994 P.2d 728. "Prosecutorial misconduct rises to the level of fundamental error when it is so egregious and had such a persuasive and prejudicial effect on the jury's verdict that the defendant was deprived of a fair trial. An isolated, minor impropriety ordinarily is not sufficient to warrant reversal, because a fair trial is not necessarily a perfect one." *Allen*, 2000–NMSC–002, ¶ 95, 128 N.M. 482, 994 P.2d 728 (internal quotation marks and citations omitted). Because Defendant did not properly preserve the following issues for appellate review, we review them for fundamental error.

{53} Defendant argues that the prosecutor improperly led Ortega on the crucial issue of identification, undermining the truth-finding process and violating principles of fundamental fairness. Defendant alleges that the leading questions asked by the prosecutor dominated the questioning of Ortega and were not merely an attempt to lay a foundation or cojole a hostile or timid witness. Defendant specifically cites to two excerpts in the record that he claims were crucial to Defendant's conviction in which the prosecutor improperly elicited testimony on the issue of identification. For example, the prosecutor asked:

Q. Do you know how many shots Charlie fired?

A. Like two.

Q. And then Silly over here took the gun?

A. Yeah.

Q. And he fired the rest?

A. At us, at Javier and Jesus.

Similarly, the prosecutor later asked:

Q. As you look at Silly here in the courtroom today, is his skin—the skin on his face the same or different than it was back then?

A. The same.

Q. And do you see like pimples or acne scars on his face?

A. Yes.

However, the following excerpt preceded both of those identified by Defendant and clearly demonstrates that Ortega identified the Defendant as the second shooter without improper testimony from the prosecutor:

Q. And after Javier said, "I can go anywhere I want, Juaritos, ... what happened?

A. They started shooting.

Q. ... [H]ow many people shot the gun?

A. Two of them.

Q. Do you see one of those people in the courtroom today?

A. Yes.

Q. Where is he?

A. Right there.

. . .

Q. And what do you know him as?

A. Silly.

. . .

Q. ... [H]ow did this shooting start?

A. When he just—when like—they just started shooting when he said, "Juaritos." When he said, "I could be anywhere I want, Juaritos," they just started shooting.

Q. Who shot the gun first?

A. Charlie.

. . .

Q. Now, you said Charlie started shooting first. Did he fire all the shots?

A. I don't think so.

Q. What happened? What did he do?

A. He was shooting, and these guys over here took the gun away from his hands and started shooting at me and Jesus.

Q. Now, who was Charlie shooting at, if you know?

A. Javier.

Q. And then who took the gun away from Charlie?

A. Silly.

Q. And then where did he shoot?

A. At me and Aaron.

As the Defendant himself concedes, "[w]hen allowed to speak freely, Juan clearly testified that Charlie shot Javier and then Silly shot at him and Jesus." Rule 11–611(C) NMRA 2002 states: "Leading questions should not be used on the direct examination of a witness except as may be necessary to develop the witness's testimony." In *State v. Orona*, 92 N.M. 450, 454, 589 P.2d 1041, 1045 (1979), the Court concluded that, under Rule 11–611(C), "[d]eveloping testimony by the use of leading questions must be distinguished from substituting the words of the prosecutor for the testimony of the witness." The Court found that the trial court "abused its discretion in such a manner as to violate principles of fundamental fairness" after it permitted every word describing the alleged offense to come from the prosecuting attorney rather than from the witness. *Id.* There, after the witness stated that she could not recall exactly what happened, the prosecutor, over instruction from the court, lead the witness with the only evidence adduced at trial which would support the charge of criminal sexual penetration in the first-degree. At that point the trial court allowed the witness to be led, and the "direct examination continued with the prosecutor graphically describing sexual acts of defendant by way of leading questions, to each of which the witness gave a simple answer of 'yes.' " *Id.* Unlike the testimony in *Orona*, the prosecutor in this case did not substitute his words for those of Ortega. As quoted above, Ortega told the story in his own words. Thus, even assuming the prosecutor improperly led the witness in the excerpts identified by Defendant, we find no prejudice to Defendant on the issue of identification. Accordingly, we conclude that the prosecutor's leading questions did not constitute fundamental error.

{54} Defendant next argues that the prosecutor improperly elicited damaging hearsay testimony on the issue of identification. He claims that it was improper for the prosecutor to question Detective Shawn regarding his identification of the shooters.

{55} Canas was arrested on a material witness warrant but was not interviewed by the defense and apparently fled the jurisdiction prior to trial. During the prosecution's direct examination of Detective Shawn, the prosecutor elicited testimony that indicated he had interviewed three eyewitnesses to the shooting: Ortega, Ortiz, and Canas. He then testified that all three identified both

Allison and Defendant as the shooters and that they had all told him that only one gun was used. Defense counsel did not timely object to this line of questioning. Defendant did object when the prosecutor asked the Detective about the witnesses' descriptions of Defendant's acne and during the prosecutor's attempt to have the Detective testify as to Canas' identification of Defendant from the photo array. In both instances the objections were sustained, but no limiting instruction was requested.

{56} We agree that Detective Shawn's statements regarding Canas' identification of Defendant was improper hearsay testimony. However, we conclude that these references to Canas' statement did not deprive Defendant of a fair trial. The jury had testimony from two other eyewitnesses, Ortiz and Ortega, that support its findings of guilt. Ortega unequivocally testified that Defendant and Allison were the shooters, and the jury was given the opportunity to consider Ortiz's prior statement to that effect. Thus, we conclude that Detective Shawn's references to Canas' testimony were not sufficiently prejudicial to require a finding of fundamental error.

{57} Defendant also asserts that the prosecutor repeatedly asked Ortiz inflammatory and irrelevant questions about his experiences as a gang member and his fear of retaliation, serving to arouse the jurors' prejudices and make Defendant look guilty by association. The State responds to this argument by claiming that "the prosecutor went to great pains to neutralize any bad feelings the jurors may have had about gangs and repeatedly cautioned the jury to judge the case only on its facts." At trial, the judge ruled that the State could introduce evidence relating to gang names and affiliation, but limited the scope and the purpose of the testimony so that it would only be admissible "insofar as it's probative of motive, state of mind, intent, and those sorts of things." On direct examination, Ortiz testified that he grew up in Barelas and was basically born and raised in the gang. He stated that he was beaten up by other gang members when he was ranked out because he was no longer hanging out with them. As discussed above,

the State also introduced evidence that Detective Shawn interviewed Ortiz the night of the shooting, although Ortiz was reluctant to testify about the details of the shooting or his prior statement at trial. The State also presented evidence that there was a verbal exchange between Allison, Defendant and Mendez and that some gang identification prompted the shooting. The prosecutor sought to show that Ortiz was aligned with the Barelas, not the Juaritos Maravilla gang. We find that such evidence was inextricably part of the State's case.

{58} Ortiz's former, or current, membership in the Barelas gang was important for two reasons. First, Ortiz's fear of retaliation went to his credibility, by showing that he had valid reasons—including the safety and well-being of himself and his family—for being less than candid about his cousin's and Defendant's involvement in the shooting at trial. Second, Ortiz's "ranking out" of the Barelas gang offered a plausible explanation for the start of the quarrel; his former comrades objected to Ortiz showing back up at the scene of his disgrace. Moreover, in his opening statement, the defense attorney was completely forthright about Defendant's gang affiliation, stating that "there is no question that Chris Trujillo is a gang member." Defense counsel went on to say that "nobody in this room is going to think that Mr. Allison or Mr. Trujillo is a Boy Scout ... We certainly can't avoid the issue that this involves gangs, something about drugs, certainly some violence." Defense counsel also spoke of a spectrum of gang involvement, trying to demonstrate to the jury that while Defendant was not a Boy Scout, he was also not a gang member "for profit, for criminal acts, for death, destruction, drug dealing, [or] intimidation." Although we recognize the danger of "guilt by association" when evidence of gang membership is introduced, such evidence is admissible to show other important elements of the crime, such as motive or intent. *See State v. Nieto*, 2000–NMSC–031, ¶ 25, 129 N.M. 688, 12 P.3d 442 (finding expert testimony on defendant's gang affiliation and specific rituals and procedures of that gang was admissible to show defendant's alleged motive). We

conclude that Defendant's gang membership was undisputed by the defense and that the State used evidence of gangs to the extent that it was relevant to its case. We therefore find no error.

{59} Defendant next claims that the prosecutor improperly injected his own opinion during closing arguments on the definition of "at" for "shooting at a dwelling or occupied building" charges. We do not address this argument since we have reversed Defendant's convictions as to all charges relating to shooting at a dwelling or occupied building.

{60} Defendant's final claim is that the prosecutor "aggravated the damage in closing by repeatedly referring to Jesus' 'story' and identification" as though it were valid evidence properly before the jury for consideration. In closing the prosecutor made two references to Canas' statement:

Let me take you to the balcony. This is where it happened, and that sounds like a consistent story and that comes from Canas and Iguado and Ortiz, you don't discount that and throw that out and try and derive the story if you're Detective Shawn
. . .

The second reference came in the middle of his argument about the consistent statements of Ortega and Ortiz:

You'd expect two completely different stories if we believe this theory that everyone in gangs lies. But what Detective Shawn found was consistent. Also the statements of Canas was that a skinny, thin Hispanic guy with acne was up on the balcony and a big-boned, heavyset guy with a ponytail significantly bigger than the thin Hispanic guy was up on the balcony and those are the two guys who committed the killing.

"We agree with Defendant that it [was] improper for the prosecution to refer the jury to matters outside the record." *Allen*, 2000-NMSC-002, ¶ 104, 128 N.M. 482, 994 P.2d 728. Viewing the prosecutor's statements in the context of the individual facts and circumstances of this case, however, we do not find that they had such a persuasive and prejudicial effect on the jury's verdict that Defendant was deprived of a fair trial. "Parties alleging fundamental error must demon-

strate the existence of circumstances that 'shock the conscience' or implicate a fundamental unfairness within the system that would undermine judicial integrity if left unchecked." *State v. Cunningham*, 2000-NMSC-009, ¶ 21, 128 N.M. 711, 998 P.2d 176. The jury had before it evidence from two other eyewitnesses that identified Defendant as one of the shooters. Because we find substantial evidence in the record to support Defendant's convictions, and because Defendant failed to demonstrate circumstances that "shock the conscience" or show a fundamental unfairness, we find no fundamental error.

## IX.

{61} Defendant next asserts that the multiple conspiracy charges and convictions violate the Double Jeopardy Clause where there was no evidence of any agreement, let alone separate agreements to support separate charges. Because of our disposition of Defendant's convictions for conspiracy to commit depraved-mind murder and conspiracy to commit shooting at a dwelling or occupied building, the only remaining conspiracy conviction is conspiracy to commit aggravated battery. Thus, we do not address Defendant's double jeopardy argument. We find sufficient evidence to support Defendant's one conviction for conspiracy to commit aggravated battery and affirm this conviction.

{62} Conspiracy is a specific intent crime. *See Baca*, 1997-NMSC-059, ¶ 51, 124 N.M. 333, 950 P.2d 776. "In order to be convicted of conspiracy, the defendant must have the requisite intent to agree and the intent to commit the offense that is the object of the conspiracy." *Varela*, 1999-NMSC-045, ¶ 42, 128 N.M. 454, 993 P.2d 1280; *see also Baca*, 1997-NMSC-059, ¶ 51, 124 N.M. 333, 950 P.2d 776. The agreement need not be verbal, but may be shown to exist by acts which demonstrate that the alleged co-conspirator knew of and participated in the scheme. *See State v. Deaton*, 74 N.M. 87, 90, 390 P.2d 966, 968 (1964). The agreement may be established by circumstantial evidence. *Id.* at 89, 390 P.2d at 967. Both Ortega and Ortiz indicated that one of the two men shot first at Mendez, and then

the gun was handed off to the other who immediately shot at Ortega and Canas. At trial, Ortega positively identified Defendant as the second shooter, stating that he took the gun away from Allison and began shooting at Ortega and Canas. According to Ortiz's statement, after Defendant resisted Allison's request for the gun, Defendant told the four down below, "You guys think I'm joking," and began shooting. Furthermore, both Ortiz and Ortega indicated that the shooting was the result of a verbal conflict between competing gang members. Ortega testified that he heard someone on the balcony ask them what they were doing in their barrio—meaning the Barelas barrio—and that he was talking to Canas, Ortega and Mendez, all Juaritos. As noted above, Mendez then responded, "we can go anywhere we want, Juaritos." We find that the passing of the gun between Allison and Defendant and the evidence of a verbal conflict between the competing gang members immediately preceding the shooting is sufficient evidence for a rational jury to find beyond a reasonable doubt that either by words or acts there was an agreement to shoot at the men located below the balcony with a deadly weapon.

## X.

{63} Defendant argues that cumulative error requires a reversal in this case. "In New Mexico the doctrine of cumulative error is strictly applied." *Stills*, 1998–NMSC–009, ¶ 51, 125 N.M. 66, 957 P.2d 51 (quoting *State v. Martin*, 101 N.M. 595, 601, 686 P.2d 937, 943 (1984)). It cannot be invoked when " 'the record as a whole demonstrates that the defendant received a fair trial.' " *Id.* Because we have vacated all convictions for which we found error, and there is otherwise no error to accumulate, we conclude that the defendant received a fair trial and that the doctrine is not applicable in this case.

## XI.

{64} Lastly, Defendant claims that his thirty year sentence constitutes cruel and unusual punishment in violation of the Eighth Amendment to the United States Constitution and Article II, Section 13 of the New Mexico Constitution. However, as Defendant did not raise this issue below, it was not properly preserved for appellate review. "[A] non-jurisdictional claim not raised in the lower court is not properly reviewable on appeal." *State v. Burdex*, 100 N.M. 197, 201, 668 P.2d 313, 317 (Ct.App.1983) (finding defendant's constitutional claim of cruel and unusual punishment was not asserted at the trial court and was therefore not properly preserved for appeal because such a claim is non-jurisdictional).[4] We therefore review Defendant's claim for fundamental error.

{65} Defendant asserts that his sentence was disproportionate to his involvement in the crime as evidenced by the fact that the jury did not convict him of willful and deliberate murder, or of aggravated battery against Mendez, but rather of first-degree depraved-mind murder, which meant the jury clearly believed that Allison, not Defendant, shot the fatal shots. Defendant urges us to find that because of these facts, and because he was a child at the time of the crime, his sentence is so disproportionate as to "shock the general conscience" or "violate principles of fundamental unfairness." We acknowledge that "[a] sentence may constitute cruel and unusual punishment if its length is disproportionate to the crime punished," *Burdex*, 100 N.M. at 202, 668 P.2d at 318, and that it is within "the province of the judiciary to review whether a sentence constitutes cruel and unusual punishment in violation of a constitutional provision." *State v. Rueda*, 1999–NMCA–033, ¶ 10, 126 N.M. 738, 975 P.2d 351. We conclude that Defendant's thirty year sentence with the possibility of

---

**4.** Defendant asserts that an unconstitutional sentence is an illegal sentence that may be challenged for the first time on appeal, relying on *State v. Sinyard*, 100 N.M. 694, 695, 675 P.2d 426, 427 (Ct.App.1983) and *State v. Smith*, 102 N.M. 350, 351–353, 695 P.2d 834, 835–837. Defendant's reliance on these cases is misplaced.

In those cases the defendants were not challenging their sentences as violations of the constitutional prohibition against cruel and unusual punishment, but rather were claiming that their sentences were illegal as not authorized under the applicable statute.

good time credit does not constitute fundamental error.

{66} Section 31–18–15.3(D) provides: "When an alleged serious youthful offender is found guilty of first degree murder, the court shall sentence the offender pursuant to the provisions of the Criminal Sentencing Act. . . . The court may sentence the offender to less than, but not exceeding, the mandatory term for an adult." Adults convicted of first-degree murder "shall be punished by life imprisonment or death." Section 31–18–14(A). However, under the statute, juvenile offenders convicted of first-degree murder "may be sentenced to life imprisonment but shall not be punished by death." *Id.* It is rare that a term of incarceration, "which has been authorized by the Legislature, will be found to be excessively long or inherently cruel." *State v. Augustus*, 97 N.M. 100, 101, 637 P.2d 50, 51 (Ct.App.1981) (finding that the trial court's sentence did not constitute cruel and unusual punishment because it did not exhibit a deliberate indifference to defendant's medical needs, even though prior to sentencing defendant underwent open heart surgery and his surgeon expressed his belief that defendant should never be incarcerated due to his medical problems). As summarized above, there was sufficient evidence to convict Defendant of first-degree depraved-mind murder as either a principal or accessory and conspiracy to commit aggravated battery. Accordingly, we conclude that a thirty year sentence with the opportunity for good time was authorized by statute and not constitutionally disproportionate to the crimes involved.

### XII.

{67} For the reasons stated above, we vacate Defendant's conviction for conspiracy to commit depraved-mind murder and reverse Defendant's convictions for conspiracy to commit shooting at a dwelling or occupied building (great bodily harm), conspiracy to commit shooting at a dwelling or occupied building (resulting in injury), shooting at a dwelling or occupied building (no injury), and conspiracy to commit shooting at a dwelling or occupied building (no injury). We affirm Defendant's convictions for first-degree de-praved-mind murder and conspiracy to commit aggravated battery.

{68} *IT IS SO ORDERED.*

WE CONCUR: PATRICIO M. SERNA, Chief Justice, and PETRA JIMENEZ MAES, Justice.

GENE E. FRANCHINI, Justice (concurring in part, dissenting in part).

PAMELA B. MINZNER, Justice (concurring in part, dissenting in part).

MINZNER, Justice (concurring in part, dissenting in part).

{69} I would remand this case for a new trial. The majority holding otherwise, I respectfully dissent.

{70} I agree that Defendant properly invoked this Court's mandatory appellate jurisdiction, that he failed to preserve a Confrontation Clause claim, that he was improperly convicted of conspiracy to commit depraved mind murder, and that he was improperly convicted of multiple counts of conspiracy to commit shooting at a dwelling or occupied building. Thus, I concur in parts II, III(A), V, and VI.

{71} Defendant's claims of prosecutorial misconduct and cruel and unusual punishment arising from his sentence could arise on remand, so I agree these questions ought to be reached; additionally, I agree with the majority's disposition on the merits. I also agree that there was sufficient evidence to support the conviction of conspiracy to commit aggravated battery. Because we consider improperly admitted evidence when evaluating the sufficiency of the evidence on appeal, *State v. Post*, 109 N.M. 177, 181, 783 P.2d 487, 491 (Ct.App.1989), I agree that there is sufficient evidence supporting the conviction of depraved mind murder as a principal or as an accessory. I therefore also concur in parts IV, VIII, IX and XI.

{72} I would, however, remand for a new trial because I believe for the following reasons that the admission of the tape and transcript of Joseph Ortiz's interview with the police was reversible error. I therefore re-

spectfully dissent from part III(B). The majority admits Ortiz's out of court statements under Rule 11–803(X) NMRA 2002. I disagree for three reasons.

{73} First, I am not persuaded that the requirements for admission under Rule 11–803(X) were satisfied. Further, despite a brief reference to that rule, the trial court may not have admitted the statement on that basis. Finally, I do not think that the use of Rule 11–803(X) in this context comports with its drafters' intentions. Because none of the other rules upon which the State relied appear to be applicable, I would reverse the convictions of depraved mind murder, aggravated assault, and conspiracy to commit aggravated battery, and remand for a new trial on these counts. In view of my disposition of part III(B), I would not reach the ineffective assistance of counsel and cumulative error claims found in parts VII and X.

{74} Rule 11–803(X) provides:

A statement not specifically covered by any of the foregoing exceptions but having equivalent circumstantial guarantees of trustworthiness, [is not included in the hearsay rule] if the court determines that:

(1) the statement is offered as evidence of a material fact;

(2) the statement is more probative on the point for which it is offered than any other evidence which the proponent can procure through reasonable efforts; and

(3) the general purposes of these rules and the interests of justice will best be served by admission of the statement into evidence. However, a statement may not be admitted under this exception unless the proponent of it makes known to the adverse party sufficiently in advance of the trial or hearing to provide the adverse party with a fair opportunity to prepare to meet it, the proponent's intention to offer the statement and the particulars of it, including the name and address of the declarant.

This rule expressly requires that the proffered statement have "equivalent circumstantial guarantees of trustworthiness." I believe that Ortiz had a motive to lie and therefore his statement lacked circumstantial guarantees and was inherently untrustworthy. I conclude that Rule 11–803(X) does not provide a basis for admitting the statement.

{75} It is true that Ortiz's statement did implicate his own cousin, and one could reason that Ortiz would not implicate a family member with a statement unless he believed it to be true. Ortiz, however, *did* have a motive to shift the blame for the fatal shot from his cousin to Defendant, assuming—as I think we can—that Ortiz was aware that eyewitnesses put both his cousin and Defendant on the balcony, and assuming familial loyalty to his cousin. Although accessory liability might make Defendant legally culpable whether or not he fired the fatal shots, I think it is fair to say that most people would view a shooter who missed his target less culpable than one who slays his target. The fact that Ortiz most likely would view his cousin as being less culpable had he not fired the fatal shots significantly diminishes any circumstantial guarantee of trustworthiness based on the notion that people do not implicate family members unless believing it to be true. *Cf. State v. Torres*, 1998–NMSC–052, ¶ 18, 126 N.M. 477, 971 P.2d 1267 (agreeing that, in the analogous context of statements against penal interest, the subjective beliefs of the declarant about legal culpability are relevant to determining the admissibility of the hearsay).

{76} The majority also reasons that because Ortiz put himself and his family in danger by giving a description of the shooters to the police, it is less likely that he lied. Any danger inherent in a *true* identification of a gang member, however, would also seem to argue *against* the candor of such a statement, especially to the police. Faced with the possibility of gang retaliation, Ortiz might have felt pressure to give an incomplete or inaccurate description of the events.

{77} In fact, the State introduced evidence of Ortiz's and Defendant's gang membership to explain why Ortiz may have lied at trial and to provide a motive for the quarrel. I agree that Ortiz's fear of retaliation shows that he has valid reasons for "being less than candid about his cousin's and Defendant's involvement in the shooting at trial." Majority Opinion, ¶ 58. His fear could have had

the same effect on his statement to the police. In this vein, Ortiz's "ranking out" of the Barelas gang certainly provided a plausible explanation for the start of the quarrel. It also provides a plausible explanation for a less than candid statement to the police about that quarrel.

{78} Both familial loyalty and fear of retaliation could lead to an inference that Ortiz would not have made the statement to the police unless he believed it to be true. On the other hand, both facts also argue that the statement he gave was less than candid. Evidence that supports two contradictory inferences is properly said to have proved neither. *State v. Garcia*, 114 N.M. 269, 275, 837 P.2d 862, 868 (1992). Familial loyalty and fear of retaliation would seem to argue more forcefully *against* a truthful statement; at the very least they do not provide circumstantial guarantees of trustworthiness. Because Rule 11–803(X) requires an affirmative showing of such guarantees, I do not believe that it provides a basis for admitting this statement.

{79} I also note that the detective who took Ortiz's statement felt that Ortiz was lying to him. On cross-examination, Detective Shawn testified that at the time of the interview he felt that Ortiz knew who the shooters were but was concealing their identity. He also testified that he was unaware at the time of the interview that Ortiz and Allison were cousins. Detective Shawn's frustration that Ortiz was hiding the identity of the shooters is understandable. Either out of fear of gang retaliation or out of familial loyalty to Allison, Ortiz had every motive to be less than candid with the police. The same motivation that influenced Ortiz to neglect to name the two men on the balcony would, I think, encourage him to shift the blame for the fatal shot from his cousin to Defendant. In this case the person in the best position to gauge the candor of the out of court statement was Detective Shawn, who alone observed Ortiz's demeanor at the time of the interview. When the person in the best position to judge a witness's candor feels that the witness was being less than truthful, I am uncomfortable holding that the witness's statement bears circumstantial guarantees of trustworthiness.

{80} We have said—and as a general matter I agree—that we should defer to the discretion of the trial judge on evidentiary matters. *State v. Ross*, 1996–NMSC–031, 122 N.M. 15, 20, 919 P.2d 1080, 1085. Such deference, however, has less force in this case, where it is less than clear from the record that the trial court relied upon Rule 11–803(X) in its ruling. In fourteen pages of transcript discussion, the trial court only once mentions Rule 11–803(X) and it certainly cannot be said to be the thrust of the State's argument. The State initially proffered the out of court statements under Rule 11–803(E) NMRA 2002. After a lengthy discussion of that rule, the State noted, "There are some other exceptions that I could argue or basis on the rules of evidence that I could argue for the admission of this, but that [, Rule 11–803(E),] I think is [the principal basis]." After Defendant's response to the State's argument, the State proffered several other grounds for the admission of the statement: Rule 11–801(D)(1)(c) NMRA 2002, Rule 11–803(X), Rule 11–804(A)(3) NMRA 2002, and Rule 11–613(B) NMRA 2002. During its discussion of Rule 11–803(X), the State recognized that it had not satisfied all of the requirements of the rule: "I realize that notice should be given sufficiently in advance of trial to allow counsel to prepare, but I think the Court is well aware of the circumstances under which Mr. Ortiz has appeared here. And I think that notice requirement is a somewhat flexible requirement." The trial court never expressly decided whether the notice requirement is flexible enough to allow use of the rule absent notice.

{81} In response to these arguments, the trial court initially indicated that the statement was admissible as a combination of Rule 11–801(D)(1)(c) and 11–803(E). In making its final ruling, the trial court mentions, for the first time, Rule 11–803(X):

> I think [that there are] grounds for me to go ahead and allow it at least to be played for the jury, just not admitted into evidence as an exhibit, but for all the other reasons that were cited by [the State],

803X and some of the other 804–A3. I do believe it's appropriate to allow that.

The court then noted that the State could have impeached Ortiz with every line of the out-of-court statement, and that it was more efficient to just play the tape to the jury. While it is unclear from the transcript what the exact grounds for the trial court's ruling were, it is clear that Rule 11–803(X) did not play a significant role in the deliberations. The trial court never made an express ruling that the three textual requirements of Rule 11–803(X) had been met, nor did it rule that the State's failure to comply with the notice requirement was excusable. Under those circumstances, I am not persuaded that the reasons for the principle of deference apply.

{82} The Court of Appeals has said of the essentially identical predecessor to Rule 11–803(X) that it "cannot be read to mean that hearsay which almost, but not quite, fits another specific exception, may be admitted under the 'other exceptions' subsection. . . ." *State v. Barela*, 97 N.M. 723, 726, 643 P.2d 287, 290 (Ct.App.1982). In this case the State appears to me to rely on this rule in a way the Court of Appeals rejected as contrary to its purpose. As its first sentence makes clear, Rule 11–803(X) should be used in a novel situation not considered by the drafters and not "specifically covered by any of the foregoing exceptions. . . ." It should not be used when the statement is of a type expressly considered by other exceptions, but which does not satisfy the rules those exceptions establish.

{83} In this case, the State initially offered the testimony under Rule 11–803(E) (recorded recollection), and that was the focus of most of its discussion. The State also offered the hearsay under a number of other rules: Rule 11–613(B) (extrinsic proof of prior inconsistent statements), Rule 11–801(D)(1)(c) (statements of identification), Rule 11–804(A)(3) (one of the definitions of unavailable) and Rule 11–803(X). None appears to support the use of Ortiz's interview with the police.

{84} We have already noted in the related case *State v. Allison*, 2000–NMSC–027, ¶ 30, 129 N.M. 566, 11 P.3d 141, that Rule 11–803(E) is not a proper ground for the admission of this statement. In that case, we ultimately allowed the admission of Ortiz's out-of-court statement under Rule 11–803(X), not on the merits, but because the defendant in that case did not argue against the use of that rule. *Id.*, ¶ 31. Rule 11–804(A)(3) is simply the definition of unavailable that would apply to Ortiz and is not a ground for the admission of the statement. Rule 11–613(B) would allow, in this case, for the impeachment of Ortiz with extrinsic proof of those out-of-court statements, but would not allow them to come in for substantive purposes.

{85} Finally, Rule 11–801(D)(1)(c) (statements of identification) would not allow the statements to come in because Ortiz's interview did not identify either of the two shooters but instead described the shooting. Majority Opinion, ¶ 4. *State v. Lopez*, 1997–NMCA–075, 123 N.M. 599, 943 P.2d 1052 recognizes that courts ought to give a narrow interpretation of the word identification, stating: "Identification in its usual sense hinges upon a witness' recognition of a suspect and ability to match the person then to the person now and give assurances that this is the same individual." *Lopez*, 1997–NMCA–075, ¶ 11, 123 N.M. 599, 943 P.2d 1052. In this case Ortiz described seeing a "big guy" and a "little guy." He also described what each was wearing and told how the big guy asked for the gun, but the little guy did not want to give it to him. The little guy then yelled at the four below, "You guys think I'm joking," before shooting. Although this description might help the police find the alleged perpetrators, I do not believe we ought to characterize it as a statement of identification under Rule 11–801(D)(1)(c), because in it Ortiz did not match any current suspect to the people he witnessed at the crime scene.

{86} In this case, the State was faced with an out-of-court statement that was almost, but not quite, a recorded recollection under 11–803(E), and was almost, but not quite, a statement of identification under Rule 11–801(D)(1)(c). The statement was thus "specifically covered by [some] of the foregoing exceptions. . . ." Rule 11–803(X). It did not, however, satisfy the requirements of any of those exceptions. In this situation the use of

Rule 11–803(X) seems contrary to its purpose, and allows the State to avoid the requirements of the hearsay rule and its normal exceptions.

{87} I would reverse the trial court's determination that Ortiz's hearsay statement was admissible and reverse Defendant's convictions. I do not think that Rule 11–803(X) allows the admission of his statement because the elements of that rule are not met, because the trial court did not seem to rely on that rule in its decision, and because the use of Rule 11–803(X) in this context seems contrary to its purpose. Because I find none of the other rules relied upon by the State and the trial court persuasive, I would remand for a new trial and not allow the sub-

stantive use of the evidence. I respectfully dissent from part III(B). I concur in parts II, III(A), IV, V, VI, VIII, IX and XI. Because of my disposition of Defendant's evidentiary objection, I would not reach parts VII or X.

I CONCUR: GENE E. FRANCHINI, Justice.