The slip opinion is the first version of an opinion released by the Chief Clerk of the Supreme Court. Once an opinion is selected for publication by the Court, it is assigned a vendor-neutral citation by the Chief Clerk for compliance with Rule 23-112 NMRA, authenticated and formally published. The slip opinion may contain deviations from the formal authenticated opinion.

**IN THE SUPREME COURT OF THE STATE OF NEW MEXICO**

Opinion Number:

Filing Date: February 23, 2026

**NO. S-1-SC-40452**

**STATE OF NEW MEXICO,**

     Plaintiff-Appellee,

v.

**RUBEN BENAVIDEZ,**

     Defendant-Appellant.

**APPEAL FROM THE DISTRICT COURT OF BERNALILLO COUNTY**
**Brett R. Loveless, District Judge**

Bennett J. Baur, Chief Public Defender
Anne T. Amicarella, Assistant Appellate Defender
Santa Fe, NM

for Appellant

Raúl Torrez, Attorney General
Peadar Séamas Ó Conchobhair, Assistant Solicitor General
Santa Fe, NM

for Appellee

**OPINION**

**VARGAS, Justice.**

**I.    INTRODUCTION**

{1}    Defendant Ruben Benavidez shot and killed his mother's boyfriend, Victim Cedric Guzman, after a brief confrontation on the doorsteps of Victim's apartment. The killing was recorded by a home security video camera mounted above the apartment's front door. Defendant, who testified at trial, admitted that he killed Victim. However, he disputed whether the killing was deliberate, instead asserting that he was provoked. The jury found Defendant guilty of first-degree murder and two counts of tampering with evidence for concealing evidence of the crime.

{2}    Defendant appeals his convictions directly to this Court. *See State v. Trujillo*, 2002-NMSC-005, ¶ 9, 131 N.M. 709, 42 P.3d 814 ("We conclude that serious youthful offenders convicted of first-degree murder shall be allowed to invoke this Court's mandatory appellate jurisdiction under Article VI, Section 2 of the New Mexico Constitution and Rule 12-102(A)(1) [NMRA]."). He raises the following issues for review: (1) Is the length of Defendant's five-year parole term illegal because he is a serious youthful offender who was sentenced to less than the mandatory adult sentence of life imprisonment?; (2) Was the jury presented with sufficient evidence of deliberate intent to support his first-degree murder

conviction?; (3) Did the district court err in instructing the jury on the definition of sufficient provocation?; (4) Did counsel for the State commit prosecutorial misconduct when making certain statements during closing arguments?; and (5) Do Defendant's multiple tampering with evidence convictions violate the prohibition against double jeopardy?

{3}     Defendant's challenge to the length of his parole sentence presents a question of first impression. For the reasons discussed herein, we hold that Defendant was legally sentenced to a five-year period of parole. Defendant's remaining issues can be resolved by reference to existing law. We reject Defendant's challenges to the sufficiency of the evidence, jury instructions, and prosecutor's closing statements. However, we agree that Defendant's multiple tampering with evidence convictions violate double jeopardy. We accordingly reverse and remand on this double jeopardy issue with instructions to vacate one of Defendant's tampering convictions.

## II.     BACKGROUND

{4}     On December 17, 2022, Defendant shot and killed Victim, who was his mother's boyfriend. Defendant was seventeen years old when he killed Victim. Prior to the killing, Victim and Defendant's mother, Rubiane Valdez, had been in a relationship for approximately four years. Victim lived with Rubiane, Defendant, and Defendant's younger sister at different times throughout the relationship.

{5}     Defendant testified that Victim frequently beat Rubiane and then would turn on Defendant when Defendant tried to intervene. Defendant described several incidents where Victim assaulted him, including incidents where Victim placed him in a chokehold, held a pocketknife to his neck, and chased him with a wooden board. Defendant's description of these incidents was corroborated at trial by Defendant's younger sister and Defendant's father. Defendant also testified that Victim and Rubiane abused illicit substances together. Defendant stated that he was worried about his mother's drug use and felt protective of her, describing situations where Rubiane had overdosed in the family home and in a Walgreen's parking lot.

{6}     Approximately one month before the killing, Rubiane kicked Victim out of the family home, and Victim moved into an apartment rented by his sister. Some days later, Victim's sister went to collect Victim's belongings from the family home. Defendant barricaded the door and prevented Victim's sister from entering the home. It is undisputed that Defendant threatened Victim at this time, yelling through the closed door that he possessed a 9mm handgun that he was going to use to kill Victim. At trial, Defendant testified he made this threat because he heard Victim's voice through the door and felt intimidated. However, Victim's sister testified that Victim was not present during this interaction.

{7} On the morning of the killing, Defendant and his younger sister called their father to tell him that Rubiane had not been to the family home for about a week. The siblings asked their father to pick them up and drive them around to search for their mother. Defendant's father picked them up later that afternoon. Defendant gave his father the address to Victim's apartment and suggested that they begin their search there.

{8} The group drove to the address and spotted Rubiane's vehicle on the street outside Victim's apartment. Defendant's father told his children to go to the apartment and inquire after their mother. Both Defendant and his sister refused. Defendant's father then went and knocked on the apartment's front door.

{9} A home security camera mounted above the door recorded the fatal events that followed. At the beginning of the video, Victim can be seen peering out from inside the apartment. Defendant's father, who is standing on the sidewalk down some steps, asks Victim, "Rubiane here?" Victim does not respond and quickly shuts the door. Defendant's father turns and glances behind him, apparently towards where Defendant is waiting off-screen.

{10} Moments later, Defendant moves into view of the camera. Defendant is wearing a grey hoodie. Both of his hands are held stiffly in the hoodie's pockets. Defendant walks past his father, up the steps, and to the front door. Keeping his

hands firmly in his pockets, Defendant violently kicks the door. He takes a few steps back, comes back up, and violently kicks the door once more. Defendant then steps off to the side and adjusts his stance. While doing so, Defendant removes his left hand from its pocket and touches the end of his right pocket. As he moves, the video briefly reveals the outline of his right hand inside its pocket; his thumb and pointer finger appear to be extended as if holding a handgun.

{11} A few seconds later, Victim opens the door and aggressively steps outside towards Defendant. Defendant quickly returns his left hand into its pocket. Defendant and Victim jut their chins at each other and trade insults. Victim then spits at Defendant.

{12} Without taking his hands out of his pockets, Defendant quickly fires two shots at Victim. Victim grabs his abdomen and stumbles back into the apartment, out of view of the camera. For a few moments, Victim can be heard deliriously laughing from off-screen before the sound slowly fades away. At the same time, Defendant calmly steps back and turns towards his father, and they both walk away. About four seconds later, Rubiane appears at the front door, looks in the direction that Defendant and his father had walked towards, and then goes back into the apartment, shutting the door.

{13} After the shooting, Defendant's father took Defendant and Defendant's younger sister to pick up some clothes and food and then dropped them off at a small studio apartment rented by Defendant's older sister. At some point later that evening, Defendant hid his handgun in a ceiling vent and put his hoodie in a trash bag under a couch in the studio apartment. Police officers subsequently recovered this evidence and discovered that the hoodie's right pocket contained a bullet hole and two spent shell casings matching Defendant's handgun.

{14} An autopsy later revealed that Victim was shot in the arm and the abdomen, with the fatal bullet striking Victim's stomach, small intestine, and aorta. At trial, Defendant testified that he shot Victim because he was scared and reacted after Victim spat at him. Defendant claimed that he had no intention to harm Victim when he approached the apartment. Victim argued with Defendant and told him to "do something," and Defendant responded by telling Victim to "do something" before Victim spat in his face. Defendant testified that he lost an eye in a childhood accident and that the spit landed in his remaining eye. He stated that he could not see Victim clearly after this. Defendant testified that he shot Victim twice because he was unsure if he hit Victim the first time and was afraid Victim was going to take away his weapon and shoot him with it. Defendant later admitted that he knew he had hit Victim, but thought Victim was not seriously hurt because he heard Victim laughing.

{15}     When asked about the handgun used to shoot Victim, Defendant testified that he had acquired the weapon a few months prior to the killing because he was selling marijuana illegally and needed to support his younger sister and protect his business. Defendant also testified that he always carried the gun loaded and concealed in his waistband or pocket.

{16}     A firearms expert called by the State testified that Defendant's handgun has a safety mechanism that must be engaged or charged before it can fire, suggesting that Defendant charged the weapon before he approached Victim's apartment. The expert further testified that Defendant's handgun, when tested, required approximately seven pounds of pressure to discharge, which was a "normal" amount of pressure.

{17}     After receiving instructions on the elements of first-degree murder, second-degree murder, and voluntary manslaughter, the jury found Defendant guilty of first-degree deliberate intent murder. The jury also found Defendant guilty of two counts of tampering with evidence, with one count relating to Defendant's clothing and the other count relating to Defendant's handgun. Additional background facts will be discussed herein as relevant to our disposition.

**III.    DISCUSSION**

{18}     Defendant has raised five issues challenging his convictions and sentencing.

We discuss each of Defendant's claims in turn. We reverse one of Defendant's tampering convictions on double jeopardy grounds; we otherwise affirm his convictions and sentence.

**A.       Defendant's Five-Year Parole Term Is Legal**

**1.       Facts and standards relevant to Defendant's illegal sentence claim**

{19}     We first address Defendant's challenge to the length of his parole sentence. Under our sentencing laws, an adult defendant convicted of first-degree murder is subject to a mandatory sentence of life imprisonment or, potentially, a sentence of life imprisonment without the possibility of release or parole. NMSA 1978, § 31-18-14 (2009); *see also State v. Juan*, 2010-NMSC-041, ¶ 42, 148 N.M. 747, 242 P.3d 314 (noting that the life sentence imposed under Section 31-18-14 is mandatory). The Probation and Parole Act[1] additionally imposes a five-year period of parole on "a person who was sentenced to life imprisonment." NMSA 1978, § 31-21-10(B)

---

[1]The Probation and Parole Act, NMSA 1978, §§ 31-21-3 to -19 (1955, as amended through 2025), has been amended since the date of Defendant's December 17, 2022 offense. We generally apply the law at the time of the crime. *Aragon v. Martinez,* 2025-NMSC-046, ¶ 16, 580 P.3d 202. Our analysis thus cites the versions of the statutes applicable at the time of Defendant's offense, and our holding specifically addresses the 2009 version of Section 31-21-10. However, we note our analysis is equally supported by the 2025 version of Section 31-21-10, as the relevant statutory language has not been amended since 2009, and we omit inserting the "(2009)" date parenthetical in the numerous subsequent citations of Section 31-21-10.

(2009, amended 2025); *see also* NMSA 1978, § 31-21-5(B) (1991, amended 2023) ("'[P]arole' means the release to the community of an inmate of an institution by decision of the [parole] board or by operation of law, subject to conditions imposed by the board and to its supervision."); NMSA 1978, § 31-18-15(C) (2022, amended 2025) ("[T]he period of parole shall be deemed to be part of the sentence of the convicted person in addition to the basic sentence imposed."). An adult defendant convicted of first-degree murder is therefore subject to a five-year term of parole. Section 31-21-10(B).

{20}    However, Defendant was seventeen years old when he killed Victim and was sentenced as a serious youthful offender. *See* NMSA 1978, § 31-18-15.2(A) (1996) (defining *serious youthful offender* as "an individual fifteen to eighteen years of age" who is indicted for first-degree murder). Under our sentencing laws, a serious youthful offender may be sentenced to less than the mandatory sentence of life imprisonment. NMSA 1978, § 31-18-15.3(D) (1993, amended 2023); *see also* NMSA 1978, § 31-18-13(A) (1993) ("[A] person sentenced as a serious youthful offender . . . may be sentenced to less than the basic or mandatory sentence."); *State v. Ortiz*, 2021-NMSC-029, ¶ 16, 498 P.3d 264 (explaining serious youthful offender sentencing under our criminal sentencing laws). Thus, a district court may, in its discretion, sentence a serious youthful offender to "a term of years, rather than life."

*State v. Cates*, 2023-NMSC-001, ¶¶ 13-14, 16, 43, 523 P.3d 570; *accord State v. Tafoya*, 2010-NMSC-019, ¶ 14, 148 N.M. 391, 237 P.3d 693.

{21} Accordingly, the district court sentenced Defendant to less than life imprisonment, specifically, a definite term of thirty years of incarceration with eight years suspended. The district court also imposed a period of five-years of parole. Defendant argues that he qualifies for less than a five-year parole term under Section 31-21-10(B) because he was not sentenced to life imprisonment. Defendant asserts that the district court was instead required to impose a two-year parole term in conformance with Section 31-21-10(D) of the Probation and Parole Act, which articulates the parole terms for noncapital felony convictions.

{22} "A trial court's power to sentence is derived exclusively from statute." *State v. Chavarria*, 2009-NMSC-020, ¶ 12, 146 N.M. 251, 208 P.3d 896 (internal quotation marks and citation omitted). A district court possesses inherent discretion to sentence a defendant but must do so "within the framework of our sentencing laws." *Cates*, 2023-NMSC-001, ¶ 13. Where, as here, a defendant claims that a sentence is not authorized by statute and thus illegal, our review is de novo. *State v. Brown*, 1999-NMSC-004, ¶ 8, 126 N.M. 642, 974 P.2d 136.

## 2.    Defendant's five-year parole term is legal

{23}    Defendant's challenge to his parole term presents a question that we have not previously addressed: What parole period applies to a serious youthful offender convicted of first-degree murder but sentenced to less than life imprisonment? To answer this question, we must construe Section 31-21-10 of the Probation and Parole Act. This Court will "construe statutes, if possible, to give effect to their objective and purpose and to avoid absurd results." *State v. Chadwick-McNally*, 2018-NMSC-018, ¶ 24, 414 P.3d 326 (internal quotation marks and citation omitted). When construing a statute, we begin by looking to "the plain language of the statute" as "[t]he primary indicator of legislative intent." *Id*. (internal quotation marks and citation omitted). "And yet, we must exercise caution in applying the plain meaning rule. In interpreting statutory language as well as in much of the other work courts are called on to perform, it is necessary to think thoughts and not words." *State v. Thompson*, 2022-NMSC-023, ¶ 17, 521 P.3d 64 (internal quotation marks and citations omitted). When the language of the statute is ambiguous, or where "adherence to the literal use of the words would lead to injustice, absurdity or contradiction," we will construe a statute "according to its obvious spirit or reason." *State v. Davis*, 2003-NMSC-022, ¶ 6, 134 N.M. 172, 74 P.3d 1064. In ascertaining this legislative rationale, we may consider "the history and background" and "the

overall structure of the statute we are interpreting, as well as the particular statute's function within a comprehensive legislative scheme." *State v. Rivera*, 2004-NMSC-001, ¶ 13, 134 N.M. 768, 82 P.3d 939 (citation omitted).

{24}     Applying these canons of construction, we determine that the district court was required to impose a five-year period of parole on Defendant's first-degree murder conviction. We therefore affirm the length of Defendant's parole sentence.

**a.      Section 31-21-10 is ambiguous as to which parole term applies to a serious youthful offender sentenced to less than life imprisonment**

{25}     As relevant to the question presented, the Probation and Parole Act provides,

> Unless the [parole] board finds that it is in the best interest of society and the parolee to reduce the period of parole, a person who was sentenced to life imprisonment shall be required to undergo a minimum period of parole of five years. During the period of parole, the person shall be under the guidance and supervision of the board.

Section 31-21-10(B). A serious youthful offender given the mandatory adult sentence of life imprisonment is clearly "a person who was sentenced to life imprisonment" *within the plain language* of Section 31-21-10(B) and is thus subject to its five-year term of parole.

{26}     However, it is unclear whether a serious youthful offender sentenced to a term of years instead of life is "a person who was sentenced to life imprisonment" *within the meaning* of Section 31-21-10(B). This is due to the distinct characteristics of a life sentence. A defendant who is sentenced to life imprisonment will serve an

indeterminate term of incarceration and will be eligible for the possibility of parole after serving a minimum amount of prison time, which is between twenty and thirty years. *See Compton v. Lytle*, 2003-NMSC-031, ¶ 12, 134 N.M. 586, 81 P.3d 39 ("[A] life sentence does not have a determinate maximum term."), *superseded by statute on other grounds by*, *Tafoya*, 2010-NMSC-019, ¶ 16; *Trujillo*, 2002-NMSC-005, ¶ 8 (explaining that "a life sentence . . . has been interpreted to mean thirty years of imprisonment before the possibility of parole"); NMSA 1978, § 31-21-10.2(A) (2023) (authorizing parole eligibility for serious youthful offenders convicted of first-degree murder after twenty or twenty-five years of incarceration). In contrast, a defendant who is sentenced to less than life imprisonment will serve a definite term of incarceration and will commence serving parole immediately after completing that prison term. *Cf. Brock v. Sullivan*, 1987-NMSC-013, ¶ 13, 105 N.M. 412, 733 P.2d 860 (holding that "in the case of consecutive sentencing, the parole period of each offense commences immediately after the period of imprisonment for that offense"); *Gillespie v State*, 1988-NMSC-068, ¶ 2, 107 N.M. 455, 760 P.2d 147 (determining that our laws "require[] commencement of the parole period as soon as the felony sentence has been completed").

{27} Due to the distinct nature of a life sentence, we held in *Tafoya*, 2010-NMSC-019, ¶¶ 16-17, that a serious youthful offender sentenced to a term of years of

incarceration instead of life is not serving a "sentence of life imprisonment" so as to be precluded from eligibility for earning good time credits under the Earned Meritorious Deductions Act (EMDA), NMSA 1978, § 33-2-34 (1999, amended 2025). For similar reasons, we conclude that the plain language of Section 31-21-10(B), which applies to "a person who was sentenced to life imprisonment," does not clearly include a serious youthful offender sentenced to a definite term of incarceration instead of life.

{28} This conclusion does not end our inquiry, however. Although we agree with Defendant that Section 31-21-10(B) does not expressly address a serious youthful offender who receives less than a life sentence, we disagree that Section 31-21-10(D)'s two-year parole term instead applies. Section 31-21-10(D) provides, in relevant part, "[A]n inmate who was convicted of a first, second or third degree felony and who has served the sentence of imprisonment imposed . . . shall be required to undergo a two-year period of parole." Defendant asserts that he falls within this two-year parole category. But our Legislature has designated first-degree murder a capital felony, not a first-degree felony. *See* NMSA 1978, § 30-2-1(A) (1994) ("Whoever commits murder in the first degree is guilty of a capital felony."). The district court's mitigation of Defendant's sentence does not transform the legislative classification of his capital crime. *Cf. State v. Ameer*, 2018-NMSC-030,

¶¶ 10, 68, 458 P.3d 390 (noting the Legislature's continued authority to classify certain crimes as capital felonies for nonconstitutional purposes after abolishment of the death penalty).

{29} In fact, we explained in *Cates*, 2023-NMSC-001, that this distinction between capital and noncapital felonies is relevant to interpreting a serious youthful offender's eligibility to earn good time credits under the EMDA. In *Cates*, we reaffirmed *Tafoya*'s holding that a serious youthful offender sentenced to less than life is not serving a "sentence[] of . . . life imprisonment" so as to preclude eligibility to earn good time credits. *Cates*, 2023-NMSC-001, ¶¶ 22-28 (internal quotation marks and citation omitted). But we clarified that a district court must affirmatively exercise its discretion to award a serious youthful offender eligibility to earn good time credits. *Id.* ¶¶ 32-33. We reasoned that the Legislature expressed an intent to distinguish between capital and noncapital offenses in our criminal sentencing laws. *Id.* ¶ 33; *see also Juan*, 2010-NMSC-041, ¶ 42 (noting "the Legislature's manifest intent to treat noncapital felonies that carry a *basic sentence* of life imprisonment differently from capital felonies, which carry a *mandatory sentence* of life imprisonment"). Given the statutory distinction between capital and noncapital offenses, we would not presume that a serious youthful offender is eligible to earn good time credits in the absence of "an express exercise of discretion by the

sentencing court." *Cates*, 2023-NMSC-001, ¶ 34. Similarly, we will not presume here that a serious youthful offender convicted of a capital crime is an "inmate convicted of a first . . . degree felony" under Section 31-21-10(D) such that a two-year parole term would apply.

{30}  The Probation and Parole Act is therefore ambiguous with respect to the period of parole that should apply to a serious youthful offender who receives less than the mandatory adult sentence of life imprisonment. Under the plain language alone, such an offender is neither clearly "a person who was sentenced to life imprisonment," § 31-21-10(B), nor clearly "convicted of a first . . . degree felony," § 31-21-10(D).

{31}  Defendant suggests that the rule of lenity should resolve this ambiguity, leading to a two-year parole term in accordance with Section 31-21-10(D). Under the rule of lenity, we will strictly construe an ambiguous criminal statute in favor of a defendant. *State v. Ogden*, 1994-NMSC-029, ¶ 25, 118 N.M. 234, 880 P.2d 845; *see also Thompson*, 2022-NMSC-023, ¶ 26 ("Under the rule of lenity, the tie must go to the defendant." (internal quotation marks and citation omitted)). However, before lenity may apply, the statutory ambiguity must be "insurmountable," and "lenity is reserved for those situations in which a reasonable doubt persists about a statute's intended scope even *after* resort to the language and structure, legislative

history, and motivating policies of the statute." *Ogden*, 1994-NMSC-029, ¶¶ 25-26 (internal quotation marks and citation omitted); *accord State v. Anaya*, 1997-NMSC-010, ¶ 32, 123 N.M. 14, 933 P.2d 223.

{32}    Here, we conclude that the structure, history, and motivating policies of the Probation and Parole Act dispel the ambiguity regarding the parole term that applies to a serious youthful offender sentenced to less than life imprisonment. Specifically, we discern that the Legislature intended that a serious youthful offender convicted of first-degree murder serve a five-year period of parole, regardless of any mitigation in the offender's prison sentence. Because the Probation and Parole Act is not inscrutably ambiguous, the rule of lenity does not apply.

**b.      The structure, history, and policies of the Probation and Parole Act clarify that a five-year parole term applies**

{33}    The Legislature has expressed a purpose that the Probation and Parole Act "be liberally construed" so that parolees are treated with "consideration [of] their individual characteristics, circumstances, needs and potentialities as revealed by case study, and that [parolees] shall be dealt with . . . under parole supervision when a period of institutional treatment is deemed essential in the light of the needs of public safety and their own welfare." NMSA 1978, § 31-21-4 (1963). "In other words, tailored conditions of parole are contemplated to facilitate the rehabilitation of [parolees] and their reintegration into the community." *Aragon v. Martinez*, 2025-

NMSC-046, ¶ 19, 580 P.3d 202. To this end, our criminal sentencing laws impose a period of parole on every defendant convicted of a felony and sentenced to imprisonment for more than one year. Section 31-18-15(C) (2022); *see also Thompson*, 2022-NMSC-023, ¶ 1 ("In every felony case in which a sentence of imprisonment is imposed, the defendant is required to serve a period of parole after that sentence.").

{34} Our sentencing laws further provide instructions for designating the period of parole when the district court alters a qualifying felony conviction:

> When a court imposes a sentence of imprisonment pursuant to the provisions of [NMSA 1978, §] 31-18-15.1 [(2009)] . . . , the period of parole shall be served in accordance with the provisions of Section 31-21-10 . . . for *the degree of felony for the basic sentence for which the inmate was convicted.*

Section 31-18-15(D) (2022) (emphasis added). From this language, we discern a legislative intent to link the period of a defendant's parole to the degree and basic sentence of the defendant's crime. *Id.* We further assess that the Legislature intended the district court to disregard any mitigation in the defendant's prison sentence when designating the period of parole. *Id.*; *see also* § 31-18-15.1(A), (G) (authorizing a district court to reduce a serious youthful offender's sentence through a finding of mitigating circumstances). This intent is further confirmed by the structure of the Probation and Parole Act, which, except for certain sex offenders and inmates who

are ineligible for parole, categorizes parole period according to type of sentence or degree of crime. Section 31-21-10(B)-(D).

{35} Reading the Probation and Parole Act in harmony with Section 31-18-15(D) (2022) and in view of its liberal purpose, we conclude that the five-year parole term in Section 31-21-10(B) applies to defendants convicted of felonies which carry a basic or mandatory sentence of life imprisonment and not just defendants who are actually sentenced to life. *See Rivera*, 2004-NMSC-001, ¶ 13 ("In considering the statute's function in relation to related statutes passed by the Legislature, whenever possible we must read different legislative enactments as harmonious instead of as contradicting one another." (text only)[2] (citation omitted)). A serious youthful offender convicted of first-degree murder is "a person who was sentenced to life imprisonment" within the intended meaning of Section 31-21-10(B), regardless of whether the district court reduces the otherwise mandatory sentence of life. Thus, a serious youthful offender convicted of first-degree murder will be subject to a five-year period of parole due to the otherwise mandatory life sentence associated with that capital crime. Section 31-18-14 (imposing a sentence of life imprisonment or

---

[2]"(Text only)" indicates the omission of nonessential punctuation marks—including internal quotation marks, ellipses, and brackets—that are present in the text of the quoted source, leaving the quoted text otherwise unchanged.

life imprisonment without possibility of parole on defendants convicted of a capital felony); Section 31-18-13(A) ("[A] person sentenced as a serious youthful offender . . . may be sentenced to less than the basic or mandatory sentence prescribed.").

{36} The history of the Probation and Parole Act confirms this legislative intent to apply Section 31-21-10(B) to all serious youthful offenders sentenced for more than one year on a felony carrying a basic or mandatory sentence of life. The Legislature added the phrase "a person who was sentenced to life imprisonment" to Section 31-21-10(B) when it abolished the death penalty in 2009. 2009 N.M. Laws, ch. 11, § 4(B). Previously, the statute prescribed a five-year parole period for "a person who was convicted of a capital felony." 2007 N.M. Laws, ch. 69, § 3(B). Shortly before amending this language, the Legislature added two noncapital crimes carrying a basic sentence of life imprisonment to our sentencing laws. 2005 N.M. Laws, ch. 59, § 2(A)(1) (prescribing life imprisonment for a first-degree felony resulting in the death of a child); 2007 N.M. Laws, ch. 69, § 2(A)(2) (prescribing life imprisonment for the first-degree felony of aggravated criminal sexual penetration). In view of this history, we assess that the Legislature intended the phrase "a person who was sentenced to life imprisonment," § 31-21-10(B), to expand the five-year parole category to encompass both capital and noncapital defendants convicted of a felony carrying a sentence of life imprisonment.

{37} We therefore hold that Section 31-21-10(B) defines the applicable parole period for all serious youthful offenders convicted of first-degree murder, notwithstanding any reduction in the offender's underlying prison sentence.

**c. The five-year parole term is mandatory; the district court has no discretion to reduce a serious youthful offender's parole term**

{38} In holding that the five-year parole period prescribed by Section 31-21-10(B) applies to a serious youthful offender sentenced to less than life imprisonment, we further emphasize that this five-year parole term is mandatory and the district court has no discretion to reduce the applicable parole period.

{39} This absence of discretion is distinct from other aspects of our serious youthful offender sentencing scheme. As previously noted, the district court has been accorded significant discretion to sentence a serious youthful offender to less than the mandatory life sentence for an adult. *See, e.g.*, § 31-18-15.1(G) (providing that the district court may reduce a basic sentence by up to one-third, but "when the offender is a serious youthful offender . . . , the judge may reduce the sentence by more than one-third of the basic sentence"). Similarly, a district court may award a serious youthful offender eligibility to earn good time credits within the framework of the EMDA. *Tafoya*, 2010-NMSC-019, ¶ 21; *Cates*, 2023-NMSC-001, ¶ 34. But we are not persuaded that the Legislature intended to grant similar discretion to the

district court with respect to determining the period of a serious youthful offender's parole.

{40} For example, in *Tafoya* and *Cates*, we explained that the language, structure, and policies of the EMDA evinced an intent to allow the district court to determine whether a serious youthful offender should be eligible to earn good time credits. *Tafoya*, 2010-NMSC-019, ¶ 23; *Cates*, 2023-NMSC-001, ¶ 34. The EMDA provided that a defendant serving a life sentence is ineligible to earn good time credits; but the statute did not address the eligibility of a serious youthful offender convicted of first-degree murder and sentenced to less than life. *Tafoya*, 2010-NMSC-019, ¶¶ 11-17. A plain reading of the EMDA led to the "absurd conclusion" that such an offender had been convicted of a "nonviolent offense." *Id.* ¶ 17; *Cates*, 2023-NMSC-001, ¶ 21 ("[B]ecause first-degree murder is not enumerated as either a per se or discretionary serious violent offense, an application of the plain language of the statute would result in first-degree murder being categorized as a nonviolent offense."). In view of this potential absurdity, we reasoned that the Legislature intended for the district court to determine whether serious youthful offenders should be eligible to earn good time credits. *Tafoya*, 2010-NMSC-019, ¶ 17. We also explained that recognizing the district court's discretion to grant serious youthful offenders good time credit eligibility promoted the rehabilitative purposes of the

EMDA, as the offender would be motivated to earn credits with good behavior while incarcerated. *Id.* ¶¶ 18-19.

{41} But we cannot follow the same approach here. Nothing in the language, structure, or history of the Probation and Parole Act suggests that a district court may shorten the parole period prescribed in Section 31-21-10(B) for convictions carrying a basic or mandatory sentence of life imprisonment. In contrast to *Tafoya* and the EMDA, applying Section 31-21-10(B)'s five-year parole period to a serious youthful offender sentenced to less than life would not lead to injustice, absurdity, or contradiction. It would merely require a serious youthful offender to serve the parole term that has been statutorily tied to the offender's capital crime.

{42} Further, we assess that the parole terms designated by the Probation and Parole Act are mandatory and not subject to alteration by a district court. *See State v. Acuna*, 1985-NMCA-083, ¶ 8, 103 N.M. 279, 705 P.2d 685 (explaining that the Probation and Parole Act "by its express terms, requires a defendant to serve specific periods of parole"); *State v. Baker*, 1993-NMCA-131, ¶¶ 5-6, 116 N.M. 526, 864 P.2d 1277 (explaining that parole period is separate from basic sentence of imprisonment and that a district court's imposition of the "statutory term of parole" is mandatory); *cf.* Allison G. Karslake & Kathleen K. Townsend, *Definite Sentencing in New Mexico: The 1977 Criminal Sentencing Act*, 9 N.M. L. Rev. 131,

135-36 (1979) (suggesting that, under 1977 amendments to our parole and sentencing laws, "the length of parole has been frozen into a statutory length"). Our sentencing laws require that, if a period of parole is to be imposed, the district court must "include in the judgment and sentence . . . a period of parole to be served in accordance with the provisions of Section 31-21-10." Section 31-18-15(C) (2022). There is no indication that the Legislature intended to depart from Section 31-21-10's designated period of parole in the context of serious youthful offender sentencing.

{43}    Indeed, the Legislature has expressly delegated the authority to reduce the period of a serious youthful offender's parole to the parole board, and not to the district court. *See, e.g.*, § 31-21-10(B) ("Unless *the board* finds that it is in the best interest of society and the parolee to *reduce the period of parole*, a person who was sentenced to life imprisonment shall be required to undergo a minimum period of parole of five years." (emphasis added)). We view this scheme to be consistent with the purpose of the Probation and Parole Act, because allowing the parole board to reduce the period of parole promotes the individualized treatment and supervision of serious youthful offenders as they are rehabilitated and reintegrated into the community. Section 31-21-4. We have recognized the parole board's expertise in deciding whether a defendant should remain on parole. *See, e.g.*, *Thompson*, 2022-

NMSC-023, ¶ 30 (declining to address whether a defendant should be released on parole, as "[s]uch a decision lies within the expertise and powers of the parole board"). And when determining whether to reduce the period of parole, the parole board will have access to information that was not available to the district court at sentencing, such as information regarding the serious youthful offender's conduct while imprisoned. *See* § 31-21-10.2(C) (addressing the information that the parole board must consider when determining a serious youthful offender's eligibility for parole, including the offender's conduct while incarcerated); NMSA 1978, § 31-21-25 (2001) (addressing the powers and duties of the parole board, including the power to conduct investigations and summon reports and witnesses); NMSA 1978, § 31-21-13 (1955) (imposing a duty on prison officials "to furnish to the [parole] board such reports and records as the board shall require concerning the conduct and character of any prisoner in their custody"). Permitting the district court to shorten a serious youthful offender's parole term at sentencing—before that offender has served their prison sentence—would undermine the reintegrative and rehabilitative purposes of the Probation and Parole Act. "We will not construe a statute to defeat its intended purpose." *Aragon*, 2025-NMSC-046, ¶ 22 (internal quotation marks and citation omitted).

{44} We thus clarify that a district court does not have discretion to shorten a serious youthful offender's parole term, which for a first-degree murder conviction must be set at five years. Section 31-21-10(B). It follows that the district court legally sentenced Defendant to a five-year period of parole. We therefore affirm Defendant's judgment and sentence with respect to the imposed period of parole.

**B. Sufficiency of the Evidence for First-Degree Murder**

**1. Standards relevant to Defendant's sufficiency of the evidence claim**

{45} We next address Defendant's challenge to the sufficiency of the evidence supporting his first-degree murder conviction. The due process clause demands that a conviction rest on proof beyond a reasonable doubt for every element necessary to constitute an offense. *State v Radosevich*, 2018-NMSC-028, ¶ 14, 419 P.3d 176; *In re Winship*, 397 U.S. 358, 364 (1970). "[T]he test to determine the sufficiency of evidence in New Mexico . . . is whether substantial evidence of either a direct or circumstantial nature exists to support a verdict of guilt beyond a reasonable doubt with respect to every element essential to a conviction." *State v. Sutphin*, 1988-NMSC-031, ¶ 21, 107 N.M. 126, 753 P.2d 1314. "[S]ubstantial evidence means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *State v. Baca*, 1997-NMSC-059, ¶ 14, 124 N.M. 333, 950 P.2d 776 (internal quotation marks and citation omitted), *abrogated on other grounds by*,

*State v. Revels*, 2025-NMSC-021, ¶ 37, 572 P.3d 974. Our role in reviewing the sufficiency of the evidence is "to determine whether *any* rational jury could have found each element of the crime to be established beyond a reasonable doubt." *State v. Garcia*, 1992-NMSC-048, ¶ 27, 114 N.M. 269, 837 P.2d 862. We will "not evaluate the evidence to determine whether some hypothesis could be designed which is consistent with a finding of innocence." *Sutphin*, 1988-NMSC-031, ¶ 21. Instead, we "resolve all disputed facts in favor of the [s]tate, indulge all reasonable inferences in support of the verdict, and disregard all evidence and inferences to the contrary." *State v. Rojo*, 1999-NMSC-001, ¶ 19, 126 N.M. 438, 971 P.2d 829.

{46} Defendant was convicted of first-degree, willful and deliberate murder. Section 30-2-1(A)(1). To sustain Defendant's conviction, the State was required to prove beyond a reasonable doubt that Defendant killed Victim with the deliberate intention to take away Victim's life. *Garcia*, 1992-NMSC-048, ¶¶ 15, 17. The jury was instructed in accordance with UJI 14-201 NMRA:

> A deliberate intention refers to the state of mind of the defendant. A deliberate intention may be inferred from all of the facts and circumstances of the killing. The word deliberate means arrived at or determined upon as a result of careful thought and the weighing of the consideration for and against the proposed course of action. A calculated judgment and decision may be arrived at in a short period of time. A mere unconsidered and rash impulse, even though it includes an intent to kill, is not a deliberate intention to kill. To constitute a deliberate killing, the slayer must weigh and consider the question of killing and his reasons for and against such a choice.

*See State v. Holt*, 2016-NMSC-011, ¶ 20, 368 P.3d 409 ("The jury instructions become the law of the case against which the sufficiency of the evidence is to be measured." (text only) (citation omitted)). "Intent is subjective and is almost always inferred from other facts in the case, as it is rarely established by direct evidence." *State v. Duran*, 2006-NMSC-035, ¶ 7, 140 N.M. 94, 140 P.3d 515 (internal quotation marks and citation omitted).

{47}    The jury was also instructed on second-degree murder, UJI 14-210 NMRA, and voluntary manslaughter, UJI 14-220 NMRA, as lesser included offenses of first-degree murder. *See also* § 30-2-1(B) (second-degree murder); NMSA 1978, § 30-2-3(A) (1994) (voluntary manslaughter). Second-degree murder includes "a rash or impulsive killing," *Garcia*, 1992-NMSC-048, ¶ 22, and "is committed without the deliberation and premeditation required for first-degree murder," *State v. Adonis*, 2008-NMSC-059, ¶ 16, 145 N.M. 102, 194 P.3d 717. "The difference between second-degree murder and voluntary manslaughter is sufficient provocation," a required element of voluntary manslaughter. UJI 14-220. "Otherwise, the elements for both [second-degree murder and voluntary manslaughter] are the same." *State v. Gaitan*, 2001-NMCA-004, ¶ 11, 130 N.M. 103, 18 P.3d 1056.

## 2.    There is sufficient evidence of deliberate intent

{48}    Defendant argues that there was insufficient evidence of deliberate intent to support his first-degree murder conviction and that the evidence shows, at most, a rash and impulsive killing. The State contends the jury could reasonably infer from the evidence that Defendant went to Victim's apartment with the deliberate intention to kill Victim. The State suggests that the security video alone provides substantial evidence of Defendant's intent, as the video shows that Defendant aggressively confronted Victim while holding a charged handgun concealed in the pocket of his sweatshirt. The State also emphasizes Defendant's prior threat to kill Victim.

{49}    We agree with the State that there is sufficient evidence on which the jury could find beyond a reasonable doubt that Defendant deliberately intended to kill Victim. This finding is supported, in part, by Defendant's provocative actions, words, and demeanor towards Victim. Defendant arranged to be taken to Victim's apartment on the morning of the killing, and after confirming Victim's presence in that apartment, approached Victim in a highly confrontational manner. He violently kicked on the front door of the apartment, checked the gun in his pocket, and then goaded Victim by trading insults and telling Victim to "do something." The jury could reasonably infer a deliberate intent to kill from Defendant's engagement with and immediate aggression towards Victim. *See State v. Gonzales*, S-1-SC-35291,

dec. ¶ 22 (N.M. Feb. 11, 2016) (nonprecedential) (explaining that a jury could infer a deliberate intent to kill from evidence the defendant entered the scene carrying a weapon, acting "as if he was looking for a fight," and immediately engaging the victim).

{50}     Defendant also approached the apartment with his hands stiffly in his hoodie pockets and fired two shots without removing his hands almost immediately after Victim spat at him. The firearms expert called by the State testified that Defendant would have had to charge his handgun and exert a normal amount of pressure before the weapon would discharge. A jury could reasonably infer from this evidence that Defendant had prepared to shoot Victim before he walked up to Victim's apartment and kicked on the door. *See, e.g.*, *State v. Montoya*, S-1-SC-39534, disp. ord., ¶ 11 (N.M. Dec. 11, 2023) (nonprecedential) (concluding that evidence that the defendant "did not 'rack the slide' as was necessary to engage the firing mechanism," before firing the fatal shot, "suggest[ed] that [the defendant] had readied the weapon for firing at some point earlier that night").

{51}     Defendant also admitted that he shot Victim twice because he was unsure whether he had hit Victim the first time; and Defendant calmly walked away from the scene despite knowing that he had shot Victim. He notably left the scene without his mother, despite testifying that he went to the apartment to find her. Later that

evening, Defendant attempted to hide both his firearm and the hoodie that was damaged during the killing. Viewing the record in the light most favorable to the jury's verdict, a rational jury could infer from this evidence that Defendant had formed a deliberate intention to kill Victim before he initiated the fatal encounter. *See State v. Flores*, 2010-NMSC-002, ¶ 22, 147 N.M. 542, 226 P.3d 641 (concluding that sufficient evidence of deliberation could be inferred from evidence that the defendant brought a weapon to a confrontation with the victim, stabbed the victim multiple times, "immediately and calmly walked away from [the victim's] bleeding body," hid evidence, and fled the scene), *overruled on other grounds by*, *State v. Martinez,* 2021-NMSC-002, ¶ 87, 478 P.3d 880.

{52}     Additionally, Defendant and his family members testified to a long history of conflict between Defendant and Victim. Defendant also admitted that he threatened to kill Victim with the same handgun he used to commit the act. Defendant's animosity and prior threat towards Victim also supports a deliberate intention to kill. *See Duran*, 2006-NMSC-035, ¶ 9 (suggesting that a rational jury may infer deliberate intent from "evidence of [the d]efendant's attitude toward the victim" and from "the statements made by [the d]efendant").

{53}     Defendant suggests that the jury lacked sufficient evidence of a deliberate intention to kill because he testified about his perception of the fatal events and the

jury was not provided with evidence contrary to that perception. However, the jury was free to accept or reject Defendant's version of events and was not required to credit his testimony. *See Rojo*, 1999-NMSC-001, ¶ 19 ("Contrary evidence supporting acquittal does not provide a basis for reversal because the jury is free to reject Defendant's version of the facts."). The jury in this case was specifically instructed on Defendant's theory of defense, receiving instructions on the elements of both second-degree murder and voluntary manslaughter. The fact that the jury chose to convict Defendant of deliberate murder instead of these lesser offenses shows that the jury rejected Defendant's depiction of the events.

{54}     When viewed as a whole, the record provides substantial evidence on which the jury could reasonably infer Defendant's deliberate intention to kill Victim. We therefore conclude that Defendant's first-degree murder conviction is supported by sufficient evidence.

**C.     Instructional Error**

**1.     Facts and standards relevant to Defendant's instructional error claim**

{55}     We next address Defendant's challenge to the jury instructions. Defendant claims error in the definition of "sufficient provocation" given to the jury, as relevant to distinguishing the lesser included offenses of second-degree murder and voluntary

manslaughter.[3] In reviewing a claim of instructional error, our task is to determine whether a reasonable juror would have been confused or misdirected by the instructions when viewed as a whole. *State v. Munoz*, 2006-NMSC-005, ¶ 20, 139 N.M. 106, 129 P.3d 142. "[J]uror confusion or misdirection may stem not only from instructions that are facially contradictory or ambiguous, but from instructions which, through omission or misstatement, fail to provide the juror with an accurate rendition of the relevant law." *State v Benally*, 2001-NMSC-033, ¶ 12, 131 N.M. 258, 34 P.3d 1134. A defendant is entitled to an instruction in support of a defense theory so long as there is evidence to support the instruction. *See State v. Brown*, 1996-NMSC-073, ¶ 34, 122 N.M. 724, 931 P.2d 69. However, the district court may refuse a requested instruction "if the submission of the instruction would mislead the jury by promoting a misstatement of the law." *State v. Nieto*, 2000-NMSC-031, ¶

---

[3]Defendant also raises a facial challenge to our voluntary manslaughter instruction, UJI 14-220, and suggests that the instruction does not adequately inform the jury that the State bears the burden of proving sufficient provocation. However, Defendant's facial challenge to UJI 14-220 is inadequately briefed. "To rule on an inadequately briefed issue, this Court would have to develop the arguments itself, effectively performing the parties' work for them. This creates a strain on judicial resources and a substantial risk of error." *Elane Photography, LLC v. Willock*, 2013-NMSC-040, ¶ 70, 309 P.3d 53 (citation omitted). We therefore do not address this issue.

17, 129 N.M. 688, 12 P.3d 442. "Thus, a defendant has no right to have a legally incorrect jury instruction read to the jury." *Id.*

{56} The jury in this proceeding was given an instruction identical to UJI 14-222 NMRA, which provides,

> "Sufficient provocation" can be any action, conduct or circumstances which arouse anger, rage, fear, sudden resentment, terror or other extreme emotions. The provocation must be such as would affect the ability to reason and to cause temporary loss of self-control in an ordinary person of average disposition. The "provocation" is not sufficient if an ordinary person would have cooled off before acting.

At trial, Defendant's counsel proposed an instruction modifying the last sentence of the instruction to read, "The 'provocation' is not sufficient if an ordinary *17 year old male* would have cooled off before acting" (emphasis added). The district court refused the proposed instruction. Later, during deliberations, the jury asked, "Does sufficient provocation apply to the day of the incident or prior events/over time[?]" The parties agreed that the district court should refer the jurors back to the instructions. The district court thus instructed the jury: "You have been provided with all of the instructions on the law. You are to apply the law to the facts as you find them, and in this way decide the case."

{57} Defendant claims that the district court erred by refusing his proposed instruction and by failing to respond to the jury's question by instructing that the jury may consider all of the circumstances relevant to determining sufficient

provocation, including Defendant's age and history with Victim. We review this claim de novo. *State v. Taylor*, 2024-NMSC-011, ¶ 10, 548 P.3d 82 ("The propriety of jury instructions given or denied is a mixed question of law and fact which we review de novo." (internal quotation marks and citation omitted)).

**2.    We see no error in the jury instructions on sufficient provocation**

{58}    The jury here was instructed in conformance with UJI 14-222. We presume that our uniform jury instructions correctly reflect the law. *State v. Ortega*, 2014-NMSC-017, ¶ 32, 327 P.3d 1076. Defendant does not seek to rebut this presumption, but instead argues that the uniform instruction was inadequate in view of the evidence presented regarding Victim's alleged abuse of Defendant. We disagree.

{59}    As reflected in UJI 14-222, the element of sufficient provocation has a subjective component and an objective component. *State v. Taylor*, 2000-NMCA-072, ¶ 27, 129 N.M. 376, 8 P.3d 863. The objective component requires the provocation to have been sufficient to cause a temporary loss of self-control in an ordinary person of average disposition. *State v. Stills*, 1998-NMSC-009, ¶ 36, 125 N.M. 66, 957 P.2d 51; *see also Taylor*, 2000-NMCA-072, ¶ 27 (explaining that the objective component is "whether an ordinary person in the situation would have been provoked"). We have recognized that a series of past events can inform whether the circumstances give rise to sufficient provocation. *See, e.g., Sells v. State*, 1982-

NMSC-125, ¶ 7, 98 N.M. 786, 653 P.2d 162 (recognizing that the sudden disclosure of an event invoking extreme emotions, when viewed in context, could under the circumstances amount to sufficient provocation); *State v. Benavidez*, 1980-NMSC-097, ¶ 7, 94 N.M. 706, 616 P.2d 419 (listing past interactions between the defendant and the victim as relevant to the issue of sufficient provocation where the defendant was arguing with the victim and the victim "made some type of motion which could have been an attempt to strike or a move for a weapon"). However, to constitute sufficient provocation, the provocation itself "must concur with the sudden anger or heat of passion. The provocation is not sufficient . . . if an ordinary person would have cooled off before acting." *State v. Reynolds*, 1982-NMSC-091, ¶ 9, 98 N.M. 527, 650 P.2d 811.

{60} At trial, Defendant testified to a history of conflict with Victim, with the most recent interaction occurring at least a month before Defendant confronted and shot Victim. The evidence also showed that Victim insulted and spat at Defendant during this brief but fatal confrontation. We agree that Defendant's past interactions with Victim provided relevant context to assessing whether the circumstances gave rise to sufficient provocation. But the law also requires the provocation to have occurred within the heat of the moment before an ordinary person would have calmed down. *See, e.g.*, *Sells*, 1982-NMSC-125, ¶ 5 (explaining that the "provocation must concur

with sudden anger or heat of passion and an ordinary person would not have cooled off before acting"). UJI 14-222 reflects this distinction. The jury instruction thus accurately reflected the law as relevant to the issues, and the district court did not err in refusing Defendant's proposed instruction. Rather, it was up to the jury to determine how to apply the evidence to UJI 14-222's presumed accurate definition of sufficient provocation.

{61} Defendant also provided no evidence that his age was relevant to the issue of sufficient provocation, and he does not advance sufficient argument in support of this contention on appeal. We therefore do not consider this issue. *See State v. Clifford*, 1994-NMSC-048, ¶ 19, 117 N.M. 508, 873 P.2d 254 ("[T]his Court will not review issues raised in appellate briefs that are unsupported by cited authority.").

{62} Because we conclude that the jury instructions accurately reflected the law on sufficient provocation, we also conclude that the district court did not abuse its discretion by responding to the jury's question with a direction to apply the evidence to the law as previously instructed. *Cf. Juan*, 2010-NMSC-041, ¶ 16 ("The decision to issue additional jury instructions generally lies within the sound discretion of the trial court."). We therefore see no error or juror confusion arising from the instructions on sufficient provocation.

**D.    Prosecutorial Misconduct**

**1.    Standards relevant to Defendant's prosecutorial misconduct claim**

{63}    Defendant next argues that the prosecutor committed misconduct by making certain statements during closing arguments. Although a prosecutor is permitted "wide latitude" during closing arguments, the prosecutor's statements must nevertheless be based on the evidence and "fair and reasonable inferences to be drawn therefrom." *State v. Duffy*, 1998-NMSC-014, ¶ 56, 126 N.M. 132, 967 P.2d 807 (internal quotation marks and citations omitted), *overruled on other grounds by*, *State v. Tollardo*, 2012-NMSC-008, ¶ 37 n.6, 275 P.3d 110. Defendant did not object to the prosecutor's statements at trial, so we review this issue for fundamental error. *State v. Sosa*, 2009-NMSC-056, ¶ 26, 147 N.M. 351, 223 P.3d 348.

{64}    Fundamental error occurs where there is a "reasonable probability that the error was a significant factor in the jury's deliberations in relation to the rest of the evidence before them." *State v. DeGraff*, 2006-NMSC-011, ¶ 21, 139 N.M. 211, 131 P.3d 61 (internal quotation marks and citation omitted). "As with any fundamental error inquiry, we will upset a jury verdict only (1) when guilt is so doubtful as to shock the conscience, or (2) when there has been an error in the process implicating the fundamental integrity of the judicial process." *Sosa*, 2009-NMSC-056, ¶ 35. In determining whether a prosecutor's statements have given rise to fundamental error,

"we consider (1) whether the statement invades some distinct constitutional protection; (2) whether the statement is isolated and brief, or repeated and pervasive; and (3) whether the statement is invited by defense." *State v. Lensegrav*, 2025-NMSC-016, ¶ 28, 572 P.3d 924 (internal quotation marks and citation omitted). We also evaluate the statements "objectively in the context of the prosecutor's broader argument and the trial as a whole." *Sosa*, 2009-NMSC-056, ¶ 26.

**2.    Defendant has not shown fundamental error in the prosecutor's statements**

{65}    Defendant complains that the prosecutor committed misconduct by mischaracterizing his testimony about telling Victim to "do something" so as to paint Defendant as the only aggressor, and by inaptly comparing the firearm expert's testimony about the seven pounds of pressure required to fire Defendant's handgun to lifting a five-pound bag of sugar. However, we assess that the prosecutor's statements merely characterize Defendant's and the expert's testimony in light of the other evidence and testimony presented at trial. The prosecutor's closing statements thus "state[] conclusions and inferences reasonably drawn from the facts and circumstances and were within the permissible range of argument." *Duffy*, 1998-NMSC-014, ¶ 58 (internal quotation marks and citation omitted); *cf. Lensegrav*, 2025-NMSC-016, ¶¶ 30-31 (explaining that a prosecutor committed misconduct by making assertions in opening arguments that the prosecutor knew would not be

supported by evidence). The statements also do not invade Defendant's constitutional rights and were isolated and brief. Thus, even if we were to conclude that the prosecutor mischaracterized the record, those mischaracterizations would not shock the conscience or implicate the fundamental integrity of the trial so as to rise to the level of fundamental error.

{66}   Defendant next complains that the prosecutor improperly referenced World War II during closing arguments and stated, "[T]he winner of battle writes the history."[4] Defendant suggests that the prosecutor's World War II metaphor improperly characterized his decision to testify at trial as "reprehensible." We

---

[4]The prosecutor's World War II metaphor was as follows:

So, in every one of these types of cases, what I like to say is that the winner of the battle writes the history. And what does that mean? We'll talk about World War II. When the Allies win World War II and the Axis loses, the Allies write the history. They make the determination of who was right and who was wrong. Civil war, same thing. If the South would have won the Civil War, our history would have been different. And in this case, that's how that plays out here. We heard some allegations against [Victim] as to misdeeds on his part, on drug usage, on his part. There's a lot about drug usage on everybody's part, but we heard about some violent interactions between . . . Defendant and [Victim]. What we didn't hear was [Victim's] perspective of this. The winner of the battle tells the history. So you have to make a decision on the credibility of the witnesses who are telling you what a bad guy [Victim] is, and you have to weigh that credibility on how that factors into this case.

disagree. When read in context, the prosecutor's statements related to the evidence presented regarding Victim's drug use and alleged abuse of Defendant. The statements do not suggest that it was somehow improper for Defendant to testify in his own defense. Moreover, the statements cannot be construed as a comment on Defendant's constitutional rights because Defendant chose to testify at trial. *See Rojo*, 1999-NMSC-001, ¶ 56 ("Given that Defendant . . . testified in his own defense at trial, the prosecutor's statement during closing arguments cannot be construed as a comment on Defendant's failure to testify."); *but cf. State v. Sena*, 2020-NMSC-011, ¶¶ 18-19, 470 P.3d 227 (explaining that a prosecutor commits misconduct by directly or indirectly commenting on a defendant's Fifth Amendment right not to testify). Further, we note that other witnesses testified about Victim's past behavior, and the prosecutor's World War II metaphor was equally applicable to these witnesses' credibility. "The prosecutor may comment on the credibility of defense witnesses." *Rojo*, 1999-NMSC-001, ¶ 56 (internal quotation marks and citation omitted). The prosecutor's metaphor also was not repeated and was responsive to testimony solicited by Defendant regarding Victim's alleged abusive conduct. Thus, we conclude that these statements do not rise to the level of fundamental error and do not provide a basis for a new trial.

**E.     Defendant's Multiple Tampering Convictions Violate Double Jeopardy**

**1.     Standards relevant to Defendant's double jeopardy claim**

{67}   Finally, Defendant claims that his multiple punishments for tampering with evidence violate his Fifth Amendment rights protecting him against double jeopardy. The double jeopardy clause provides only limited protection. *State v. Ramirez*, 2018-NMSC-003, ¶ 38, 409 P.3d 902. "In the multiple punishment context, the Double Jeopardy Clause does no more than prevent the sentencing court from prescribing greater punishment than the legislature intended." *Swafford v. State*, 1991-NMSC-043, ¶ 7, 112 N.M. 3, 810 P.2d 1223 (text only) (citation omitted). Because the double jeopardy clause only protects a defendant from receiving more punishment than intended, the issue, "though essentially constitutional, becomes one of statutory construction." *Herron v. State*, 1991-NMSC-012, ¶ 6, 111 N.M. 357, 805 P.2d 624.

{68}   As relevant to Defendant's multiple tampering convictions, "Tmpering with evidence consists of destroying, changing, hiding, placing or fabricating any physical evidence with intent to prevent the apprehension, prosecution or conviction of any person or to throw suspicion of the commission of a crime upon another." NMSA 1978, § 30-22-5(A) (2003). Defendant asserts that his acts of concealing his handgun in a ceiling vent and hiding his gun underneath the couch in the same studio apartment are insufficiently distinct to support two punishments under this statute.

We review this double jeopardy claim de novo. *State v. Benally*, 2021-NMSC-027, ¶ 11, 493 P.3d 366.

{69} Defendant was convicted of multiple violations of the same statute; thus, we examine his double jeopardy claim using a unit-of-prosecution analysis. *State v. Swick*, 2012-NMSC-018, ¶ 10, 279 P.3d 747. "In a unit-of-prosecution case, the relevant inquiry is whether the legislature intended punishment for the defendant's entire course of conduct or for each discrete act." *State v. Torres*, 2022-NMSC-024, ¶ 12, 521 P.3d 77 (text only) (citation omitted). In conducting a unit-of-prosecution analysis, we follow the "two-step framework" articulated by *Herron*. *Benally*, 2021-NMSC-027, ¶ 12. ("Throughout both steps of our unit of prosecution analysis, our focus remains on whether a defendant has received more punishments than the number of punishments that the Legislature intended to authorize under the facts and circumstances of the case.")

{70} "Under the first step of the *Herron* framework, the Court examines the charging statute for the intended unit of prosecution or, in other words, construes the statutory language to determine what conduct the Legislature has defined as a statutory offense." *Torres*, 2022-NMSC-024, ¶ 14 (internal quotation marks and citation omitted). If, after construing the statute, we are unable to determine the Legislature's intended unit of prosecution, then we proceed to the second step of the

*Herron* framework and evaluate "whether [the] defendant's acts are separated by sufficient indicia of distinctness" such that those acts "can be distinguished as discrete violations of the conduct the Legislature intended to proscribe." *Benally*, 2021-NMSC-027, ¶¶ 17-18. "If the acts are not sufficiently distinct, then the rule of lenity mandates an interpretation that the [L]egislature did not intend multiple punishments, and a defendant cannot be punished for multiple crimes." *State v. Bernal*, 2006-NMSC-050, ¶ 14, 140 N.M. 644, 146 P.3d 289.

{71}    We have previously construed the tampering with evidence statute, § 30-22-5, and determined that the Legislature has not clearly defined the intended unit of prosecution. *DeGraff*, 2006-NMSC-011, ¶¶ 34-35. We therefore proceed to the second step of the unit-of-prosecution analysis to determine whether Defendant's acts are sufficiently distinct so as to support multiple punishments. *Id.* ¶ 35. According to *DeGraff*, we should consider such indicia of distinctness as "the timing, location, and sequencing of the acts, the existence of an intervening event, the defendant's intent as evidenced by his conduct and utterances, and the number of victims." *Id.* (citing *Herron*, 1991-NMSC-012, ¶ 15).

**2.      One of Defendant's tampering convictions violates double jeopardy**

{72}    The State argues that Defendant's two tampering convictions are distinct because he used two acts to conceal the evidence: he placed his hoodie under the

couch and his handgun in a ceiling vent. However, Defendant hid his gun and his hoodie at the same time and in the same, small studio apartment. There was no testimony as to any intervening events. And there was no evidence that would support an inference that Defendant's intentions were in any way distinct with respect to hiding these two pieces of evidence. Both of these items were involved in the shooting of one victim.

{73} In view of the absence of distinguishing facts in the record, we conclude that Defendant's course of conduct is not separated by sufficient indicia of distinctness to support multiple punishments under the tampering with evidence statute. For example, in *DeGraff,* we rejected the state's arguments that each act of removing evidence from a crime scene constituted a separate violation of the tampering statute. 2006-NMSC-011, ¶ 36. We concluded that the evidence supported only three of the *DeGraff* defendant's five tampering convictions because the defendant hid evidence at three different times and locations. *Id.* ¶¶ 32, 37-39. And again in *State v. Saiz,* we concluded that the evidence supported only three of the defendant's nine tampering convictions because "there were really only three conceptually separate crimes of tampering" differing by time and location, despite "dozens of individual physical acts in disposing of and altering a great number of evidentiary items." 2008-NMSC-048, ¶ 41, 144 N.M. 663, 191 P.3d 521, *abrogated on other grounds by*, *State v.*

*Belanger*, 2009-NMSC-025, ¶ 36 & n.1, 146 N.M. 357, 210 P.3d 783.

{74}    Similar to *DeGraff* and *Saiz*, the evidence shows that Defendant hid evidence on only one conceptually distinct occasion. The evidence thus supports only one tampering conviction. Accordingly, one of Defendant's two tampering convictions violates double jeopardy and must be vacated. We therefore reverse and remand with instructions to the district court to vacate one of Defendant's tampering with evidence convictions.

## IV.    CONCLUSION

{75}    We hold that Defendant was legally sentenced to a five-year parole period in accordance with Section 31-21-10(B). On Defendant's challenges to the sufficiency of the evidence, jury instructions, and prosecutor's closing statements, we additionally affirm Defendant's convictions. However, we conclude that Defendant's multiple convictions for tampering with evidence violate double jeopardy and that the evidence supports only one conviction. We therefore reverse and remand on this issue with instructions to vacate one of Defendant's tampering convictions.

{76}    **IT IS SO ORDERED.**

_____

**JULIE J. VARGAS, Justice**

**WE CONCUR:**

_____
**DAVID K. THOMSON, Chief Justice**

_____
**MICHAEL E. VIGIL, Justice**

_____
**C. SHANNON BACON, Justice**

_____
**BRIANA H. ZAMORA, Justice**